NICHOLLS, J.
Roland M. Filhiol died in the parish of Ouachita, place of his domicile, on the 18th of May, 1906, leaving a large estate, consisting of both movables and immovables, the greater part of which was in the parish named, though he owned a dwelling house and grounds at No. 1715 Second street, in the city of New Orleans. He left an olographic will, dated Logtown, Ouachita ¡parish, La., January 16, 1905. By this will •he bequeathed to his nieces, daughters of a ¡brother, $5,000 and a plantation designated toy name; to the daughter of a friend, a plan lation; to his brother, Hardy Filhiol, another plantation and $5,000; and to Laura Culpepper, $5,000. The remainder of his property he bequeathed to Miss Inez Schmidt, of New Orleans, whom he appointed testamentary executrix.
On May 23, 1906, Inez Schmidt filed an application in the district court asking for the probating of the will and the taking of an inventory of the property belonging to the succession. She prayed that H. H. Filhiol, brother of the deceased, be cited to attend the probating of the will, and that she be confirmed as testamentary executrix according to its provisions.
On the day fixed for the hearing, Hardy H. Filhiol filed an opposition to the will, in the particulars, on the grounds, and for the reasons therein set forth. In this opposition he averred that he was the sole presumptive heir and nearest legitimate kin of the deceased; that he was his brother; that he died without leaving any ascendants, or lawful descendants, or other brother or sister, or representative of any brother or sister, other than opponent; that as sole heir he opposed the probate and execution of the will.
. He averred that the disposition and bequest in favor of Inez Schmidt was .illegal, null, and void, for the reasons that the said Inez Schmidt and the testator had been living together long before and at his death in open concubinage, said Inez Schmidt being the kept woman or concubine of said Roland Filhiol for many years previous to and at the time of making and signing the will; that the testator purchased a house and lot in the city of New Orleans on the 3d of March, 1S98, wherein he maintained and supported the proponent as his concubine; that during the aforesaid illicit relations between them two illegitimate children were born to the testator and proponent; that they traveled publicly together as man and wife, and that proponent bore his name in the neighborhood where she lived; that the said bequest in favor of the said Inez Schmidt was contrary ■to public policy, and is and was in violation *1001 of article 1481 of the Civil Code of Louisiana; that he opposed the appointment of Inez Schmidt as executrix of the will on the ground that, being incapacitated as residuary-legatee for the reasons stated, she could not be named as executrix. In view of the premises, opponent prayed that the prayer for the probate and execution of the will be denied as to the bequest and disposition in favor of the proponent, Inez Schmidt; that the said bequest and disposition be declared to be illegal, null, and void, and of no effect, and that the prayer of said Inez Schmidt to be confirmed as executrix and for letters testamentary be denied; that he be recognized as the sole and only heir of Roland Fiihiol; and that as such he be put in possession of the estate, and also appointed dative testamentary executor, in order to execute the provisions of will now herein opposed. He prayed for all such further orders in the premises as might be necessary and proper, and for full, general relief, and costs.
On the same day, Inez Schmidt filed an exception of no cause of action. This was overruled. She then filed an answer, insisting upon and reiterating the exception, and denying that H. H. Fiihiol had any right, power, or authority to institute an action of nullity of part of the will in the form attempted in the present proceedings, which was purely summary in character, being an application to have the court examine the will and pass upon the form of same. She averred that opponent was one of the legatees under the provisions of the will; that he was estopped from having the part of the will probated and executed in his favor while attempting to annul and repudiate other provisions in said will, without removing and abandoning any and all rights under the will. She averred that Roland M. Fiihiol lived and had his domicile in the parish of Ouachita, where he carried on an extensive planting and commercial business throughout his whole life, and where he died at his home. She spe-' cially denied that she and R. M. Fiihiol lived together in open concubinage or otherwise, and that said charge against her and said Fiihiol was unjust, untrue, and unfounded in fact; that she had been appointed by R. M. Fiihiol the sole executrix of his last will and testament, which appointment she accepted, and opponent had set up no reason for denying and depriving respondent of her legal rights to said appointment; that the application of opponent for appointment as dative testamentary executor was totally unwarranted by law, being a large debtor of the deceased. She prayed that the prayer and demands of opponent be refused and rejected; that the will be probated and ordered executed; that letters testamentary be issued to her; and that the will in all its parts and provisions be respected and maintained. The exception of Inez Schmidt must-have been overruled, for the case went to trial without objection, and evidence heard on both sides.
During the trial opponent filed an application as sole heir of his brother, claiming that under article 1671 of the Civil Code he was entitled to take possession of the property of the estate by tendering to pay all the movable legacies and by complying with the provisions of article 1012 of the Civil Code. 1-Ie offered to deposit upon the orders of the court all sums necessary to pay the movable legacies and to give bond and security under the said article 1012. On the 19th of September, 1906, the district court rendered judgment probating the document presented by proponent, Inez Schmidt, as the last will and testament of R. M. Fiihiol, deceased. The judgment ordered that the said will be deposited with the clerk of the district, court for the parish of Ouachita, that it be filed and recorded by him in the probate record of said parish, and that said will be rendered executory and be executed according to its terms and provisions, except as to the dona *1003 tion in favor of Inez Schmidt in the said will, which provisions were in said judgment reduced to 10 per cent, of the whole amount of the estate, which donation as thus reduced was ordered to be paid out of the movables of said estate. The judgment appointed and confirmed Inez Schmidt as executrix of the last will and testament of R. M. Eilhiol, and ordered that letters testamentary issue to her accordingly, and that she be placed in possession as such upon her taking the oath required by law.
Inez Schmidt appealed from this judgment, and H. H. Pilhiol, objecting to some portions of the judgment, appealed also. '
The judgment rendered by the district judge in this case is an exceedingly able one and very carefully prepared. We have minutely examined the record, and have reached the same conclusions as he did as to the bequest made in favor of Inez Schmidt.
The ease reaches us under evidence such as to make it certain beyond dispute what the actual relations between R. M. Pilhiol and Inez Schmidt were, and this without the necessity of having recourse to inquisitorial methods and questionable testimony obtained through unreliable witnesses. Those relations were admitted by proponent herself in her testimony. She admitted that they continued unbroken from the time they commenced until Pilhiol’s death. This admission carries with it as a consequence the existence of the same relations, not only at his establishment at No. 1715 Second street, New Orleans, but at Pilhiol’s habitual residence in Ouachita, also on the Pullman ear going to Cincinnati, at the hotel, and at the private boarding house in Garfield street, in that city. We understand counsel of Inez Schmidt to concede the existence of the relations themselves, but to deny that, under the circumstances which the evidence disclosed they were carried on, those relations were relations of “concubinage” at all, and specially to deny that they were those of “open concubinage.” They maintain that R. M. Pilhiol’s home was not in New Orleans; that he did not “live at that place” with her; that the relations between them were at places far away from his home; that Pilhiol stood quoad his acts and declarations touching those relations as those of a “third person,” not binding on her unless she was present' when they were made; th^t Pilhiol was a bachelor, and his conduct was not to be scrutinized and condemned and dealt with as harshly as would be that of a married man; that the relations between the parties did not result in any scandal; that they were not generally known or spoken of until they were brought to light through the present proceedings; that no one, either on the cars or in Cincinnati, knew who they were or whether they were married or not; that the relations between these parties outside of Louisiana have no bearing or relevancy on this case.
It is undoubtedly true that Pilhiol’s habitual home was in Ouachita parish, where he had his “principal establishment”; but we think, under the evidence taken in the case, that he had likewise an “establishment” at No. 1715 Second street, which he kept up at no inconsiderable expense to himself. Civ. Code, art. 38.
That he bought that property, and furnished it, for the express purpose of maintaining it as he afterwards did, we think fairly appears. He took Inez Schmidt there, and he kept her there during the period covered by the testimony, defraying all her expenses, paying all the household bills, furnishing her with all the money she needed for dressing and for all other purposes, and ordering (under his own name) the gas to be furnished to that house. I-Ie informed the salesman at Tebault’s store that his “girl” would call to order and select furniture and that when she did so to honor her order. Pilhiol and Inez Schmidt met there for that purpose. The furniture ordered was deliver *1005 ed at No. 1715 Second street. The salesman, though not knowing her name, recognized her ■■(by the photograph shown him) as being Inez Schmidt. These facts must, we think, he admitted as facts proven on the trial. ■It is admitted by Inez Schmidt herself (and the fact is additionally shown) that he visited her at that place periodically and made ■it his residence whenever in the city; also that out of and as the result of the relations ■between these parties at that place two children, were bom. She concedes that Filhiol was the father of these children.
In the Jahraus Case, 114 La. 458, 38 South. 417, the court, referring to the contention made that, “in order to bring a case of concubinage under the provisions of article 1481, the parties must have lived together habitually,” said:
“We cannot adopt that construction. * * * We do not think it would do to say that the law will take no cognizance of a concubinage so long as the concubines abstain from actually residing together. What the law aims at is ■the ‘relation,’ the permanent relation of living together as man and wife without being married; and if that relation is maintained openly the condition of article 1481 is fulfilled, even though the parties do not reside together.”
Coutinuing, the court said:
“Under the interpretation contended for a •man might set up an establishment for a woman, visit there regularly, raise a family with her, pay her bills, educate her children, by word or conduct, or both, aver his illicit relations with her, and yet the case cannot come within the purview of article 1481 so long as he resides -elsewhere. We repeat we do not think it would ■do to put that interpretation upon article 1481.”
The case here spoken of (leaving out the facts of the education of the children, which ■does not appear, as they were too small to be sent to school) as one not to be tolerated, •is the very case before this court, unless the fact that the actual names of the parties or their antecedents or their personalities were not known to the persons in the neighborhood where those relations were carried on makes a difference. This we do not think was at all material.
Inez Schmidt left her mother’s house on Royal street as an unmarried woman and went to reside at Filhiol’s establishment on Second street. To those who knew her before she went there she was still known as Inez Schmidt, though to some persons she referred to hers'elf as “Mrs. Roland.” She bore children at No. 1715 Second street. That she was known by her associates and friends as a fact to be unmarried — in other words to be somebody’s concubine — cannot, we think, be disputed, unless we shut our eyes to almost logical conclusions. Her mother, who lived with her a long time during the continuance of the relations between the parties certainly knew that fact. (Proponent, referring to this, said “she had to have some confidante.)”
The colored man (Philibore), who knew her on Bourbon street and on Royal street, and who says that he lived a long time at No. 1715 Seco'nd street (though not as a servant), certainly knew she was not married. The servant girl, Philomene, who lived in the house for several years, knew she was not married. Fofinot, a friend of Filhiol, knew that he had a “girl” uptown, though he did not know at what exact locality, nor what the girl’s name was. The neighbors were not called on to know or to examine what her name was. Those who were examined came in some way to know her as “Mrs. Roland” (Filhiol’s Christian name) or “Mrs. Rowlins.” They did not know her socially, or what took place ’inside the house. The proponent herself reported under oath the birth of the two children at the office of the recorder of mortgages — the first being reported and recorded as Aloysius Filhiol Roland, lawful issue of Fred Roland, a native of Louisiana, and Rebecca Schmidt; the second as Nannie Ruth Roland, lawful issue of Fred Roland, a native of Monroe, La., and Rebecca Schmidt of same locality. She testified that she made these reports under instruction from Mr. Filhiol.
*1007 Proponent also reported, In different years, for the New Orleans Directory, the names of the residents at 1715 Second street, first as Ered M. Roland, then Eeo Roland, then Filhiol Roland.
J. H. Warner testified that he knew Hr. Filhiol since 1886. He did not know proponent by name, but he did by sight. He had seen her once in passing at No. 1715 Second street, and once when he went there to meet Mr. Filhiol. He learned in 1898 or 1899 that both lived there, and he had heard Filhiol give orders to send packages bought by him at Bachemin’s “up to the house,” and the people knew there where to send them. Several witnesses testified that they knew he had some girl uptown, but did not know who she was. Proponent made several visits to Filhiol at his home in Logtown during the existence of the relations between him and herself, and remained there a very considerable time on each visit. During these visits she occupied the house alone with Filhiol the whole time. The testimony of Mary Jane Filhiol, an old servant of the family, taken as a whole, as to what occurred while she was there, clearly shows the relations of the parties at that place (if any testimony were needed under such circumstances on that subject in view of antecedents). What occurred openly in her presence between the parties was scarcely consistent with the pretense that Inez Schmidt’s real position in the house at that time was that of cook. The same thing may be said of the testimony of Jones and of Thompson Wood (Filhiol’s manager at Logtown) and the clerk of the district court. To what we have already stated must be added the conceded fact that the parties (with the children and with Inez Schmidt’s mother) left New Orleans in the same car and all occupied together (until they got to Cincinnati) the drawing room of the sleeper; that when the party reached Cincinnati they all went together to the Gibson Hotel, where Filhiol first registered himself as “Roland N. Filion and lady, Mrs. S. Schmidt and child, New Orleans, La.”; hut, on having his attention called to the word “lady” he altered it to “wife.” Filhiol and the proponent occupied there the same room for two days under these circumstances. He then engaged rooms for the party at a private boarding house on Garfield street, to which Inez Schmidt, her mother, and the children went. He joined them there, and there they remained for a very considerable time, being known by his real name to the two sisters who kept the house. Mr. Saunders, who knew Mr. Filhiol and who was boarding at the same house, met them there. He did not know her personally, but he identified her by her photograph. Filhiol and proponent occupied the same room and passed there as husband and wife. The contention that the acts of the parties at Cincinnati were matters not to be considered in this suit, because they took place outside of the state of Louisiana, has no weight. They were citizens of Louisiana at the time, and they continued to be so until he died. We are not dealing with the relations of the parties under the laws of Ohio or under a criminal statute. The relations of the parties were open on the sleeper at New Orleans and when the parties were in Cincinnati. They were continuing relations commenced in this state, and were open admissions by both parties as to what those relations had been and were. The particular place where these open admissions were made and the particular place of the continued existence of illicit relations of the parties are matters of no moment. The fact that Filhiol was a bachelor at the time he held these relations with proponent is a matter having no bearing on the case. The lawmakers make no^ distinction between a bachelor and a married man, and we can make none. The principles of law which we announce to-day will cover the case to-morrow of a married man. It is against the policy of the law *1009 that bachelors should make themselves the heads of illegitimate families, instead of legitimate families. The decisions of this court and the laws of Louisiana show in what high regard the people of this state hold matrimony. Exceedingly strict scrutiny and proof is by our courts required from parties claiming the benefit of marriage, where their status as such is challenged. The reluctance with which divorces are granted here evidences the same spirit, while the apparently harsh statutes touching natural children — the innocent offspring of illicit connections — negative any claim made that such connection receives the support and encouragement of our lawmakers.
We cannot conceive that our lawmakers intended, by enacting article 1481 of the Civil Code, to offer a premium for the successful concealment from the general public of undoubtedly existing relations of concubinage, which can be established without having recourse to inquisitorial methods and questionable witnesses.
The claim that Filhiol stands as to his acts and declarations touching the relations between himself and the proponent as those of a third person, which do not bind her unless she was present when they were made, is without any basis whatever. The acts, conduct, and declarations of both parties have to be examined into in the decision of questions of this character. They form links in the chain of events which go to make up the whole situation. They are all parts of the res gestse. Proponent does not present herself in this case as holding an adverse claim as a creditor by contract, express or implied, against Filhiol’s estate. She positively repudiates that any agreement as to renunciation for services was ever made. She claims as beneficiary of Filhiol’s legacy, and “she takes” only when, under the law, “he can give.” Her own conduct is not to be lost sight of. It is claimed that the relations between those parties gave rise to no scandal. They were unknown. That they might be unknown to people moving in the same sphere with Filhiol and not coming into direct contact with persons of his surroundings may be true, for men of position, do not proclaim from the housetops their illicit connections. It by no means follows, however, that persons in proponent’s sphere of life do not and did not know them, though they might not have spoken. Relations of that character are so frequent in some quarters that they excite no comment, though known, and give rise to no public scandal. It is easy to understand that, though Filhiol’s friends might be morally certain of the existence of illicit relations between him and sonfe woman, their friendship for him would keep their lips closed to spreading knowledge-of the fact. In this particular case Filhiol lived, as we understand, in a very sparsely inhabited neighborhood. Some of the persons in the vicinity doubtless cared very little what relations Filhiol may have had. Others, from prudential business considerations, refrained from referring to them. Opponent testified that he was himself satisfied that the woman whom he saw at his brother’s house was not there under proper conditions. The facts in the present case are entirely different from those disclosed in Succession of Jahraus. Conditions there were such as to authorize the court to consider the action as one discountenanced by the lawmaker. It was one where members of a family were seeking for their individual benefit and through inquisitorial methods and by questionable witnesses to drag into light and have judicially declared the frailty of a female relative, who by reason of death was powerless to vindicate herself and her own good name and character. It was a case where every instinct of family pride and family affection should have urged and dictated a different course.
*1011 Here matters are different. Silence on the part of relatives would not save the situation. EilhioPs acts in making the bequest he did, under the circumstances shown, of themselves invited inquiry and promoted •scandal.
The occasion here calls for no inquisitorial methods, nor the use of questionable witness•es. In the present case the actual facts .are shown through the admissions of Inez Schmidt herself and those of the deceased, not only by his own actions, but also under 'his own handwriting. In the Jahraus Case •one of the parties was dead. The other denied under oath the existence of any illicit relations.' The conclusion reached by the • court as to the actual relations between the parties was not necessary for the purposes •of that case. Such as it was, it was reached -only by the application of the strictest rules of evidence to the testimony of a questionable ■witness, unsupported by no other direct testimony.
This court would not be justified under the policy of our laws in adopting the construction of article 1481 of the Civil Code invoked by the proponent. Such a construction would not only have as its effect an encouragement to white men to bring into the world white illegitimate children and to maintain illegitimate white families, but would open wide the door without check to miscegenation and the maintaining of families of illegitimate colored children. The '.lawmakers seek to prevent miscegenation through the marriage relation by positive prohibitory statutes, and yet under proponent’s views would tolerate and give indirect •sanction to it, if brought about by a status •of concubinage, instead of one of marriage. ‘That cannot be true.
The proposition, advanced by proponent, that opponent is estopped from this action because he did not renounce the special legacy made to him in the will, is absolutely without force. He is undoubtedly the legal heir of the deceased. He has been so proved, and is. so recognized herein. As such he has an unquestionable right to have the bequest made to Inez Schmidt set aside, if it be an illegal bequest. If it be set aside, that bequest inures at once to opponent as the legal heir. Why should the legal heir renounce the special legacy, and in whose interest should he do so? If the bequest to Inez Schmidt be set aside, she has no legal interest or concern as to the particular persons upon whom the balance of the succession would go. It certainly would not go to her. The renunciation of the special legacy by the legal heir would be absolutely motiveless; for, if renounced, the amount falling to him would immediately revert to him as legal heir. No one has a legal interest as to whether he should receive this amount under the title of legatee or that of heir.
The complaint made by the proponent that the court should have allowed opponent to have advanced, at the time he did, the issues which he raised in this litigation,(would not justify a reversal of this case, even if it would have been better as a matter of practice to have remitted opponent to a later and separate proceeding. It is too late now, after matters have gone this far, to undo what has been done and start de novo. That would be worse than useless.
We are of the opinion that the judgment of the court appealed from is correct, and it is hereby affirmed.
BREAUX, O. J., concurs in the decree. PROVOSTY and MONROE, JJ., dissent.