187 So.2d 520 (1966)
Succession of W. J. (Wallie) KEUHLING.
Gerald J. KEUHLING et al., Plaintiffs and Appellants,
v.
Nedia MEYERS, Defendant and Appellee.
No. 1727.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1966.
Rehearing Denied June 29, 1966.
*521 Deshotels & Maraist, by O. H. Deshotels, Jr., Abbeville, for plaintiffs-appellants.
Kibbe, Edwards, Cooper & Sonnier, by J. E. Kibbe, Abbeville, for third-party plaintiff-appellant.
Broussard & Broussard, by Marcus A. Broussard, Jr., Abbeville, for defendant-appellee.
Before TATE, HOOD and CULPEPPER, JJ.
CULPEPPER, Judge.
This case involves an attack on a will. Four brothers and sisters of the testator, Wallie J. Keuhling, seek to annul a bequest of immovable property to Nedia Meyers on the grounds that the decedent and Nedia Meyers lived in open concubinage (LSA-C.C. Article 1481). The district judge found there was an "illicit relationship" but not "open concubinage." The collateral heirs appealed.
We will first set forth the law. LSA-C.C. Article 1481 reads as follows:
"Those who have lived together in open concubinage are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it can not exceed one-tenth part of the whole value of their estate. Those who afterwards marry are excepted from this rule."
Succession of Jahraus, 114 La. 456, 38 So. 417 (1905), cited by all counsel herein as a leading case interpreting Article 1481, defines the word "concubinage" as follows:
"* * * the word `concubinage' as here used describes a status, and not mere acts of fornication or adultery, however frequent or even habitual."
* * * * * *
"The word `concubinage' derives from the concubinatus of the Romans, a kind *522 of marriage recognized by law, but of less dignity than the justae nuptiae, and not serving, like it, as the source of family and other legal relations. It ceased to describe legal marriage when the law came to recognize only one kind of marriage, but it continued to designate a status resembling marriage, and, at least in the civil law, does so to this day. * * * The Grand Dictionnaire of Larousse, vo. `Concubinage,' after giving the history of what is meant by concubinage, declares concubinage to be `the status of a man and woman who live together as man and wife without being married'; and it adds:
"`We must not confound the concubine with the courtesan, or even with what is ordinarily called a mistress. The concubine is an entirely different thing. It is the wife without the title; it is marriage without the sanction of the law.'"
Succession of Jahraus, supra, also holds that, despite the words "who have lived together" contained in Article 1481, the parties may live in "open concubinage" within the purview of the article even though the parties do not reside together in the same house. The rationale of this holding is explained by saying that otherwise "a man might set up an establishment for a woman, visit her there regularly, raise a family with her, pay her bills, educate her children, by word or conduct, or both, avow his illicit relations with her, and yet the case not come within the purview of article 1481 so long as he resided elsewhere."
Succession of Jahraus, supra, also discusses at length the history and interpretation of the word "open" as used in Article 1481. It is explained that in early French Law the word "notorious" was used, instead of "open". This was perpetuated in the Code Napoleon and led to many scandals resulting from scrutiny into the private lives of persons deceased. The framers of our own Civil Code, being aware of this situation, substituted the word "open" for "notorious", so that "mere notoriety should not suffice, but absence of concealment or disguise should be requisite." The court explained the rationale of the redactors of our Code as follows:
"For these reasons, they carefully and studiously confined the provision to `those who have lived together in open concubinage,' meaning by the word `open' that the concubinage should be so public as to be practically avowed, not necessarily by word, but at any rate by unambiguous, unequivocal conduct; that the relations must be such that, when sought to be made the basis of judicial action, no odious inquisitions might be necessary, and no nice poising of testimony, as in this case."
The facts in Succession of Jahraus, supra, show that the universal legatee was charged with open concubinage with his sister-in-law, the testator, whom he employed in his store. At one time she had lived in his home with his wife and children. Later she bought a house and established her own home. He escorted her home from work each night and went in and stayed 20 or 30 minutes. On Sundays he visited her house during the day. Although unmarried, she gave birth to a child, saying the father was a sea captain. Her sister, the wife of the universal legatee, knew of and consented to all of these activities and received the decedent into her home and cared for her while she was having the child. There were many rumors in the community that an illicit relationship existed. One witness, who lived in the testator's house, testified positively as to illicit relations. The court held that, whatever their relationship, it was not open concubinage; that they "hid their concubinage, if such it, in fact, was, under the cloak of an innocent relation, and to such a case article 1481, as already shown, does not apply."
There are several succeeding cases which follow generally the law as set forth in *523 Succession of Jahraus. In Succession of Filhiol, 119 La. 998, 44 So. 843 (1907) the testator, a bachelor, maintained his principal residence in Ouachita Parish; but he also maintained a home for the legatee, Inez Schmidt, in New Orleans. In the latter city they pretended to be married, adopted a fictious name and raised children. The court held they lived in open concubinage.
In Jones v. Kyle, 168 La. 728, 123 So. 306 (1929) the testator, a white man, employed the legatee, a colored woman. She worked as his cook, housekeeper and occasionally waited on customers in his store. For a while she lived in a room next to his; but thereafter in a separate house with her two nieces. Two witnesses testified it was public knowledge that they lived together as man and wife. But 12 or 15 witnesses, who were in a position to know, from having visited the home, etc., testified they had never seen or heard of any improper relations between the two. The court concluded by holding as follows:
"But be that as it may, the fact remains that according to the preponderance of the evidence the deceased did not publicly avow his relations with the defendant, but on the contrary kept her in his employ ostensibly as cook and housekeeper and assistant in his store, and that their relations were not those of `open' concubinage, but only of illicit intercourse and secret concubinage. To fall under the ban of article 1481, R.C.C., the concubinage must be open."
In Succession of Washington, 222 La. 707, 63 So.2d 610 (1953), a case on which plaintiffs strongly rely, the facts show that the testatrix, a negress, operated a house of prostitution in New Orleans, thinly veiled as a rooming house. The legatee, a white man, lived in the house, assisted her in the management of her illicit business, procured bail for the women when arrested and kept the property repaired, etc. He showed her affection by embracing and kissing her in the presence of others; and she referred to him as her "boyfriend" and her "husband". He cared for her during her last illness and arranged for and attended the funeral. The court held that "to the associates, relatives, and employees of the deceased the relation was admitted and that as to them no effort was made to conceal it, and we conclude that Vargo and the testatrix lived together in open concubinage."
See also Toussant v. National Life & Accident Insurance Company, 147 La. 977, 86 So. 415; Texada v. Spence, 166 La. 1020, 118 So. 120, 62 A.L.R. 281; Succession of Lannes, 187 La. 17, 174 So. 94; and Succession of Moore, 232 La. 556, 94 So.2d 666.
With this understanding of the law, let us examine the facts of the present case. The testator, Wallie J. Keuhling, died on November 22, 1961, leaving no ascendants or descendants. He left 2 wills, written on the same day, July 9, 1955. By one will he bequeathed to his wife, Mrs. Stella Pullin Keuhling, the usufruct of all community property; about $66,000 of realty and $54,500 of movables. By the other will he bequeathed to Nedia Meyers all of his separate property, consisting of realty appraised in the succession proceedings at $3,510.35. His brothers and sisters attack the bequest to Nedia Meyers on the grounds that she lived in open concubinage with him. They also seek judgment against her for the amount by which certain alleged inter vivos donations of cash exceeded "one-tenth part" of the testator's whole estate, as provided in Article 1481.
Mr. Keuhling lived in a small South-Louisiana community called "Boston", where he ran a store. During the winter months he also bought furs from trappers in the marsh. He maintained several marsh camps in connection with this business.
Nedia Meyers, while still a "young child", did housework in Mr. Keuhling's *524 home. She married Otis Boudreaux in 1933, but separated from him that same year. She testified that in about 1934 and 1935 she did housework, washing, cooking, etc. for various parties. The record is not clear as to where she lived during this time but she did not live in the testator's home. She never did live in the testator's home.
In about 1936 she bought a lot in Abbeville and later built a house on it, where she still lives. It was about this same time that she started working for Mr. Keuhling during the winter months of the trapping season. She says she cooked and cleaned at the camps, took trappers and their families back and forth to the marsh by boat, took groceries and supplies to the camps and helped burn the marsh. She also cooked for social gatherings and "political parties" held by Mr. Keuhling at the camps. She says Mr. Keuhling paid her in cash for these services, on a per job basis, rather than a regular salary.
Nedia Meyers also testified that about once a week she went with the testator to Lafayette to buy his meat and vegetables. She freely admits that he visited in her home in Abbeville 2 or 3 times a week; that he was welcome at anytime; and that he frequently stayed until 10 or 11 o'clock p. m., but she says he never spent the night there. She also testified that she visited him in the hospital when he was sick and that he visited her when she was sick; they went to New Orleans together several times but never spent the night, except on one occasion when they took Miss Birdie Keuhling, a sister of the testator, and close friend of Nedia Meyers, for an operation. She says they went to Washington, D. C. on one occasion, but they went in her uncle's car and her uncle drove.
In about 1950 Nedia Meyers took a beauticians course and opened a small shop in Abbeville. Since that time she says she worked in her beauty shop except for the occasions when she worked for Mr. Keuhling at the camps during the trapping season or for special parties.
Nedia Meyers also testified that in 1960 she loaned Mr. Keuhling $5,000 for which he gave her a promissory note. The note is dated December 9, 1960. A few days before the testator died he requested the Bank of Abbeville to pay Nedia Meyers $5,000, which was done by money order. She says this constituted payment of the note which she later delivered to the bank.
Nedia Meyers was the only witness for the defense. Twelve witnesses were called by the plaintiffs.
Three witnesses, Ignace Dugas, Leevis J. Menard and Claudis Clement, testified they worked in the marsh as trappers for Mr. Keuhling; they saw him and Nedia Meyers on trips to the marsh together; when they spent the night the trappers would stay in their part of the camp and Nedia and the testator in another room. They said she cooked and cleaned the camp and helped handle the furs.
Mr. W. O. Brown went to one of the camps with Mr. Keuhling and Nedia in about 1948 on a goose hunt. He testified they spent the night; he slept in one room and they slept in the other; and that Nedia cooked and cleaned the camp. He had also seen her at the camp cooking for some of the "political suppers".
Maurice Bernard, a store employee of Mr. Keuhling, testified that, at the testator's direction, he frequently delivered groceries to the home of Nedia Meyers; that many times he drove Mr. Keuhling to her house at night and returned to pick him up 2 or 3 hours later.
Parties plaintiff, or close relatives, who testified, were Mrs. Esther Keuhling Rice, Allen Rice, Jr., a nephew, Robert Keuhling and Gerald Keuhling. These witnesses testified generally that the testator and Nedia Meyers had gone on trips together to New Orleans, Washington and Mexico; *525 that the testator referred to Nedia Meyers as his "jeunne femme", i. e., young wife and to his legal wife as his "vielle femme", i. e., his old wife; that he often went to her house at night; that he took her to the marsh to the camps; that people generally joked about the testator being a "sport" with the ladies; that there were many rumors about the relationship between the testator and Nedia Meyers.
It is noteworthy that despite this relationship with Nedia Meyers, the testator continued to live with his wife at Boston, never separated from her, and bequeathed her almost all of his estate. She did not testify in these proceedings as to her knowledge of or attitude toward, her husband's relationship with Nedia Meyers.
Mr. Roy Broussard and Mr. Emile Solier, president and vice president, respectively, of the Bank of Abbeville, testified specifically as to the payment of the $5,000 and the note held by Nedia Meyers. They also testified that although they had lived in the community for years they did not know of any illicit relationship between the testator and Nedia Meyers and had never even heard any rumors to that effect. They knew Nedia and Mr. Keuhling, both having been customers of the bank, but they had not heard of any illicit relationship between them.
We think the trial judge correctly concluded the evidence proves an adulterous relationship and that this relationship was known to many people. It was known to some of Mr. Keuhling's employees, as for instance, the trappers at the camps in the marsh and the clerk in the store who frequently drove Mr. Keuhling to Nedia's home; also to certain members of Mr. Keuhling's family; and to some of his friends, as for instance, Mr. W. O. Brown who went on the goose hunt. Nevertheless, the evidence falls far short of proving the status of this relationship was concubinage, or that it was open, as these terms have been interpreted in our jurisprudence. The testator did not live together with Nedia Meyers openly and publicly as man and wife. At no time did he live in the same house with her, or provide a house for her. Nor did he provide that other necessities of life, such as food, clothing, etc. He did not have children by her. Summarizing, he did not openly and publicly avow, by word or conduct, that he was living with Nedia Meyers as if she were his wife. Instead, they attempted, though perhaps not very successfully at times, to cloak the relationship under the disguise of employer and employee.
As the court said in Succession of Jahraus, supra, the word "concubinage" as used in LSA-C.C. Article 1481 "describes a status, and not mere acts of fornication or adultery, however frequent or even habitual." Furthermore, the court said the word "open" used in this article means "free from concealment, reserve, or disguise, not secret or secretive, plain and aboveboard."
Under the evidence in this case, the relationship between the testator and Nedia Meyers may have been that of frequent or habitual adultery, but it was not concubinage. Also, the relationship was not open. It was not flaunted without reserve before the public but, instead, there was an attempt to conceal and disguise it.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the appellants.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
SAVOY, J., recused.