SHORTESS, Judge.
Nacis J. Theriot (defendant and plaintiff-in-rule) appeals from an adverse judgment on a rule to eliminate all alimony to his former wife, Peggy Terrebonne Theriot (plaintiff and defendant-in-rule). The parties obtained a final judgment of divorce on March 3, 1978, and permanent alimony of $1,100.00 per month was awarded to defendant-in-rule in that judgment. A community settlement was also entered into between the parties on the same date, conveying to defendant-in-rule various tracts of land, the family home (valued at $200,- *590 000.00), and $150,000.00 in cash. Plaintiff-in-rule brought this rule to terminate all alimony, alleging a change in circumstances sufficient to eliminate alimony, and also alleging that his former wife had entered into open concubinage. (LSA-C.C. art. 160(A)(4). After a trial on the rule, the trial court, with written reasons for judgment, held that plaintiff-in-rule had not shown a change in circumstances and failed to establish that defendant-in-rule was living in open concubinage.
Plaintiff-in-rule argues in brief that the trial court failed to consider the facts which he alleges demonstrated that defendant-in-rule was living in open concubinage, both before and after September 22, 1982. That date was the effective date of Act 580 of the 1982 Regular Legislative Session which amended LSA-C.C. art. 160 to provide that open concubinage would permit the termination of permanent periodic alimony. He further argues that the trial court failed to consider evidence concerning his precipitous drop in income; that the trial court failed to consider the facts allegedly indicating defendant-in-rule had sufficient means of her own and was therefore not entitled to alimony.
The trial court’s resolution of the “change in circumstances” prong of plaintiff-in-rule’s attack on the alimony award to his former wife was not clearly wrong. Plaintiff-in-rule claims that his income, at one time rather high, fell drastically as a result of the recession in the oil industry. The trial court found that plaintiff-in-rule still has sufficient income to enable him to pay the alimony. The trial court further found that plaintiff-in-rule failed to prove that his former wife’s financial condition had changed from bad to good, or that she was capable of supporting herself. We need not address further those findings of fact since they are not clearly wrong.
Because, however, the 1982 amendment to LSA-C.C. art. 160 terminating a spouse’s right to alimony upon his or her entering into open concubinage has never been discussed by this court, we will analyze the facts of this case as they relate to LSA-C.C. art. 160(A)(4). The trial court found that while there was definitely an illicit relationship between defendant-in-rule and Adair, they went to great lengths to avoid the appearance of “living together as man and wife.” The court concluded that plaintiff-in-rule failed to establish that defendant-in-rule was living in open concubinage.
Thomas v. Thomas, 440 So.2d 879 (La. App. 2d Cir.), writ denied, 448 So.2d 697 (La.1983), was the first case in Louisiana to discuss the “open concubinage” amendment to LSA-C.C. art. 160. Thomas, summarized briefly, held that in order to find “open concubinage,” two separate elements must be addressed: openness, and concubinage. Former LSA-C.C. art. 1481, repealed by Acts 1987, No. 468, Section 1, which provided that “open concubinage” rendered persons living in that state incapable of making donations to one another, contained identical terminology to LSA-C.C. art. 160. Therefore, judicial interpretations of “open concubinage” as it appeared in that article were equally apropos to LSA-C.C. art. 160(A)(4). Thomas, 440 So.2d at 883. “Openness” in that context means the absence of any pretense or disguise which would provide a morally acceptable cloak for an illicit relationship. Thomas, 440 So.2d at 882. “Concubinage” is a relationship of sexual content in which a man and woman live together as husband and wife in a state of affairs approximating marriage. Although cohabitation is generally an aspect of concubinage, it is not essential. Thomas, 440 So.2d at 881.
Defendant-in-rule admitted that she and Adair had lived together for two months in 1982 before he moved into a rented house across a vacant lot and behind her house. Adair testified that he lived with defendant-in-rule briefly before he moved into the rented house, where he lived from September 1982 to June 1983. Plaintiff-in-rule’s investigator testified that his surveillance revealed a pattern: Adair would come home early in the morning from his job as a bartender, stop briefly at his home to change clothes, and walk across the vacant lot and let himself into defendant-in-rule’s house, where he would stay all night. *591 Defendant-in-rule bought clothes and jewelry for Adair; however, she and Adair both testified that these were gifts. There was no evidence that defendant-in-rule was supporting Adair. He paid his own rent and utility bills.[1]
Co-workers of Adair’s testified that they visited him at defendant-in-rule’s house, that he spoke freely of his love affair with defendant-in-rule, and that although he lived in the small house behind defendant-in-rule’s, actually he stayed at her house much of the time. Defendant-in-rule would sometimes visit Adair at his job, staying there until the lounge closed, and then they would go out for breakfast. At the time of trial, defendant-in-rule testified that she had last seen Adair some three weeks before. He had moved in June 1983 to La-rose. In January 1987 he had moved to Houma to live with his parents.
Although the evidence is clear that Adair and defendant-in-rule were lovers, the investigator’s testimony demonstrates that defendant-in-rule and Adair detected his presence almost immediately after the surveillance began, and, as the trial court noted, “went to great lengths to avoid the appearance of living together as man and wife.” On one occasion, Adair hid himself in the garage and spent the night watching for the investigative team hired by plaintiff-in-rule. Eventually, Adair complained to the local police and the surveillance came to an abrupt stop. When Adair walked across to defendant-in-rule’s house, he would wear dark clothing; the investigator believed this was an attempt to avoid detection. Certainly this kind of behavior does not indicate “openness” as it has been interpreted by our courts.
Plaintiff-in-rule argues that Adair and defendant-in-rule attempted to circumvent the law because Adair rented a house next door to defendant-in-rule in September 1982, the effective date of the amendment; and that regardless of where Adair received his mail and hung his hat, he was in fact defendant-in-rule’s paramour and they were living in open concubinage. We disagree. Plaintiff-in-rule has perhaps proven a relationship which, in a pre-divorce situation, could be held to be adulterous. However, there is insufficient proof of open concubinage in the record before us to constitute justification for terminating an award of permanent periodic alimony. Open concubinage is not adultery, nor is it merely an ongoing sexual relationship. Evidence of an adulterous relationship known to many people is not sufficient proof of open concubinage. Succession of Lamy, 454 So.2d 290 (La.App. 4th Cir.), writ denied, 458 So.2d 477 (La.1984).
Plaintiff-in-rule has simply not met his burden of proof. Although we agree with his position that a former spouse should not be allowed to do end-runs around the law by shamming a relationship as “closed” which is actually a marriage in all but name, in order to continue receiving permanent periodic alimony payments, that simply is not the situation here. The relationship between Adair and Theriot was certainly not “open” and, arguably, was not even “concubinage.” The trial court’s decision was not clearly wrong. All costs of this appeal are assessed to plaintiff-in-rule.
AFFIRMED.

. Checks were introduced into the record demonstrating this fact. We note that there are two causes for termination of permanent periodic alimony provided in LSA-C.C. art. 160(A)(4): other than "open concubinage,” remarriage will serve to terminate alimony payments. "Open concubinage” is a quasi-marital relationship. Thomas, 440 So.2d at 884. We agree with Thomas that the intent of the 1982 amendment was to prevent an attempt by an ex-spouse to "re-mariy” in every way but legally, and thus continue to benefit from permanent alimony payments. In this regard, “open concubinage" as a cause for termination of alimony is analogous to re-marriage — there is no reason for permanent periodic alimony payments by one spouse to another if support for the receiving spouse is coming from another source. Here, that is clearly not the case; and in any event, the situation is reversed because plaintiff-in-rule attempted to show at trial that defendant-in-rule was supporting Adair, not vice versa.