560 So.2d 629 (1990)
Katherine Furlow PETTY
v.
Terry Don PETTY.
No. 89-CA-1584.
Court of Appeal of Louisiana, Fourth Circuit.
April 12, 1990.
Joan B. Montero, Kenner, for Katherine Furlow Petty.
Ashton R. O'Dwyer, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for Terry Don Petty.
Before SCHOTT, C.J., and CIACCIO and WARD, JJ.
WARD, Judge.
Terry Don Petty appeals a judgment awarding his former wife, Katherine Furlow, post-divorce alimony.
In 1980, after 23 years of marriage, Mr. Petty moved from the marital domicile, informing Mrs. Perry that "the marriage was not working." Mrs. Petty filed a Petition for Separation, alleging abandonment. That petition was never taken to judgment; instead, the parties obtained a divorce in February 1982 based on the ground they had lived separate and apart for over a year. The divorce decree reserved to both parties the right to a determination of fault at a later date. Because Mr. Petty has remarried, in order to avoid confusion, the former Mrs. Petty will hereafter be referred to by her maiden name of Katherine Furlow.
In 1985 Katherine Furlow filed a rule for post-divorce alimony under La.C.C. art. 160 alleging that she was entitled to permanent alimony because she was free of fault that would cause separation or divorce and because she had insufficient means for her support. Terry Petty opposed the rule and denied Katherine Furlow's right to C.C. *630 art. 160 post-divorce alimony, alleging she was living in open concubinage.
Art. 160. Alimony after divorce; permanent periodic; lump sum
A. (1) When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, permanent periodic alimony which shall not exceed one-third of his or her income. Alimony shall not be denied on the ground that one spouse obtained a valid divorce from the other spouse in a court of another state or country which had no jurisdiction over the person of the claimant spouse.

* * * * * *
(4) Permanent periodic alimony shall be revoked if it becomes unnecessary and terminates if the spouse to whom it has been awarded remarries or enters into open concubinage.
Following a hearing before a Commissioner in January 1987, the Commissioner found Terry Petty at fault in the breakup of the marriage and Katherine Furlow without sufficient means to support herself, and therefore entitled to alimony. In proceedings before the District Court Terry Petty excepted to this finding contending that the Commissioner failed to address the issue of Katherine Furlow's open concubinage with Emmett James between 1983 and 1986. The District Court remanded the case back to the Commissioner who issued a supplemental report two years after the hearing on the rule. In that report the Commissioner found Katherine Furlow had not lived in open concubinage and was therefore entitled to post-divorce alimony. Terry Petty again excepted to the finding; however, the District Court rejected his exceptions, and on June 19, 1989 the Commissioner's original and supplemental reports were made the judgment of the Civil District Court.
Terry Petty appeals the lower court judgment.
We need not consider the issue of fault because, even if Terry Petty was at fault, causing the separation and divorce, if Katherine Furlow, although now in necessitous circumstances, has lived in open concubinage she has forfeited her right to permanent alimony.
The Civil Code does not define "open concubinage", but three cases have considered its meaning; Thomas v. Thomas, 440 So.2d 879 (La.App. 2 Cir.1983), writ denied 443 So.2d 597; Gray v. Gray, 451 So.2d 579 (La.App. 2 Cir.1984), writ denied 457 So.2d 13 and Theriot v. Theriot, 546 So.2d 589 (La.App. 1 Cir.1989), writ denied 550 So.2d 635. The Thomas, Gray and Theriot courts each found there was not "open concubinage".
In Thomas the Court offered the following excellent summary:
In defining and applying the term open concubinage, the courts have historically insisted that a definite meaning be ascribed to both the words "open" and "concubinage," before finding that the legal requisites of open concubinage have been proven. "Concubinage" is derived from the Latin term Concubinatus. This term signified, in roman civilization, a relationship or cohabitation in which the man and woman generally resided together as husband and wife without the benefit of the formalities, civil effects and legal consequences of a formal marriage. Succession of Jahraus, 114 La. 456, 38 So. 417 (1905). Thus to this day, concubinage has retained the signification of a relationship in which a man and woman live together as husband and wife without being legally married. Henderson v. Travelers Ins. Co., 354 So.2d 1031 (La.1978); Succession of Moore, 232 La. 556, 94 So.2d 666 (1957); Succession of Franz, 232 La. 310, 94 So.2d 270 (1957); Succession of Jahraus, supra; Succession of Keuhling, 187 So.2d 520 (La.App. 3d Cir.1966); Purvis v. Purvis, 162 So. 239 (La.App. 2d Cir. 1935). It is crucial to the definition of open concubinage to note that it depicts a status or relationship, rather than an act or series of acts. Succession of Moore, supra; Succession of Franz, supra; Succession of Jahraus, supra; Succession of Keuhling, supra. Concubinage *631 is not constituted merely by "acts of fornication or adultery, however frequent or even habitual." Succession of Jahraus, 38 So. at 418. Moreover, "the concubine must not be confounded with the courtezan, or even with what is ordinarily called a mistress. She is the wife without a title." Gauff v. Johnson, 161 La. 975, 109 So. 782, 783 (1926). Concubinage depicts a state of affairs in which the man and woman exercise with respect to each other the rights and privileges of marriage. Succession of Lannes, 187 La. 17, 174 So. 94 (1936). Thus, concubinage could be defined as a relationship of sexual content in which man and woman live together as husband and wife in a state of affairs approximating marriage. It should be noted, however, that although living together is important to a finding of concubinage, it is not absolutely essential. Succession of Filhiol, 119 La. 998, 44 So. 843 (1907); Succession of Jahraus, supra; Succession of Keuhling, supra, Succession of Hamilton, 35 La.Ann. 640 (La.1883); Paxton v. Paxton, 173 So. 488 (La.App. 1 Cir.1937).
In applying the concept of "open concubinage", the Louisiana courts have also ascribed a definite and distinct meaning to the term "open." Thus, it is not enough that concubinage be proven. The courts have additionally required that concubinage be "open". Concubinage is said to be open, when the illicit relationship is not disguised, concealed, or made secret by the parties. Concubinage is open when the parties involved avow their illicit relationship by words or conduct. Succession of Keuhling, supra. Succession of Jahraus, supra; Succession of Keuhling, supra; Paxton v. Paxton, supra. A finding of "openness" clearly does not require that the parties verbally acknowledge their illicit relationship: "[M]en of position do not proclaim from the housetops their illicit connections." Succession of Filhiol, supra, 44 So. at 847. See also Jones v. Kyle, 168 La. 728, 123 So. 306 (1929); Succession of Jahraus, supra. However, efforts taken by the parties to conceal their illicit relationship militates against a finding of openness. Moreover, it is not sufficient that an illicit relationship be "notorious" or widely known in order for it to be "open." Succession of Jahraus, supra; Succession of Keuhling, supra. Openness constitutes a distinct and less easily achieved standard, involving the absence of any pretense or disguise which would provide a morally acceptable cloak for their illicit relationship. 440 So.2d at 881-882.
In Gray, the court added:
As indicated in Thomas, the requirement of openness does not require that a person explicitly refer to a concubine as a spouse; the requirement of openness may be satisfied by the mere absence of concealment by the parties of the illicit relationship. 451 So.2d 579, 584.
Although we agree with Thomas and Gray, the proven facts in this case differ materially and substantially from those of Thomas and Gray, and more recently, Theriot. We believe the following synopsis of the testimony conclusively shows Katherine Furlow lived in open concubinage with Emmett James.
At the hearing on the alimony rule, Katherine Furlow testified that she had known Emmett James as an entertainer since the mid-1970's. She said she began socializing with him during Christmas time 1981, when she began to care for James's 7 year old son, Mark. She and Emmett James became "good friends" eight months later. Although she denied that Emmett James lived with her, and vigorously testified that James maintained his own residence, she admitted he slept at her house quite often. When questioned how often from January or February 1983 until August or September 1986, she responded:
A. I'd say all the time he worked because it was much easier for me. I didn't have enough funds so he bought groceries.
Q. I asked you
A. Most of the time.
Q. He lived at your house most of the time?
*632 A. Right.
Q. And the child Mark lived in the house with you most of the time?
A. Correct.
Katherine Furlow also testified that she and Emmett James shared the same bedroom, and that some people believed she and Emmett James were married. Further, she stated that she and Emmett James shared some living expenses, that she laundered his clothes and cooked his meals, and that they often took their meals with his son and hers. She admitted that, Emmett James, although having a separate residence, kept clothing and toilet articles in her house.
Emmett James testified, responding to questions by counsel for Katherine Furlow,
Q. Where were you living from 1983 to 1985? Where did you live?
James bluntly declared,
A. I was living at her house.
Thus, James confirmed his relationship with Katherine Furlow. He also testified that although he owned his own residence during this period he moved some of his clothing to Katherine Furlow's house because it became "too hard to keep going back and forth", that he decided to stay at Katherine Furlow's home and pool groceries, returning to his own house only to pick up mail and check on things.
Two of Katherine Furlow's sons who attended college during this period testified. Bruce Petty, her 24 year old son, told the Court that Emmett James came to live at his mother's house about two to three years after his father left. "He stayed there, lived there." He testified that Emmett James remained until June or July 1986, kept clothes and toilet articles at the house, and shared a bedroom with his mother.
Shane Petty, Katherine Furlow's second son, testified that while he was a student in Baton Rouge from September, 1979 until May, 1986, he visited his mother on weekends and holidays and Emmett James was "quite frequently" there, sharing his mother's bedroom.
Two private investigators employed by Terry Petty testified Emmett James was frequently seen entering the house in the evening and leaving the next morning wearing different attire. On numerous occasions they observed James and Katherine Furlow at various places where Emmett James was employed as a musician, and on several occasions, they met people who believed she and James were husband and wife.
Katherine Furlow relies upon Thomas, supra, as support for her argument that this was not open concubinage. Her reliance, however, is misplaced for several reasons. In that case Mr. Thomas alleged his former wife was living in open concubinage with Ray Rachell for 3 months; Emmett James and Katherine Furlow admitted living together 2½ years. Witnesses in Thomas testified that Mrs. Thomas and Rachell slept in separate bedrooms; Emmett James and Katherine Furlow admitted they shared a bedroom. In Thomas, Rachell did not keep clothes or toiletries at Mrs. Thomas' house; Emmett James kept his clothes and toilet articles at Katherine Furlow's house. Although the Court in Thomas emphasized that the parties maintained separate residences, the Court also said: "This fact is not in and of itself fatal to a finding of concubinage." 440 So.2d at 883.
Nor do we believe Gray, supra, offers Katherine Furlow any support. Again, the Gray case involved a much shorter period of time, i.e., 7 months, than the case at hand. Mr. Gray's concubinage claim against his ex-wife was predicated principally upon the testimony of a private investigator whose only evidence was the presence of vehicles registered to Mr. Maggio parked at Mrs. Gray's house on various nights before and after midnight. The Court found this evidence insufficient and conflicting with other evidence. To make a weak case even weaker, the investigator it was shown, mistakenly identified a neighbor as Mrs. Gray, the intended subject of his surveillance. While Mr. Maggio admitted to paying Mrs. Gray's expenses, his largesse was rooted in a concern for the welfare of his minor son living with Mrs. *633 Gray (Mr. Maggio married and divorced Mrs. Gray prior to her marriage to Mr. Gray). Because there was no explicit testimony that Mr. Maggio lived with Mrs. Gray, the Court concluded Mr. Gray failed to produce evidence sufficient to prove his case.
In Theriot, supra, Mrs. Theriot admitted she lived with Mr. Adair for two months prior to his moving into a rented house across a vacant lot behind her own house. There was, no showing of shared expenses, and unlike this case, the parties attempted to "hide" their relationship. The Theriot court concluded that although Mr. Theriot had perhaps proven a relationship which, in a pre-divorce situation, could be held to be adulterous, there was insufficient proof of open concubinage.
In this case the Commissioner first made a finding that Katherine Furlow lived with Emmett James; but the Commissioner concluded that Terry Petty was at fault in the breakup of the marriage and Katherine Furlow was entitled to permanent alimony. Two years later, upon remand from the District Court, the Commissioner ignored the previous finding of fact, relied on Thomas, supra, and found the relationship was not open concubinage.
Based on the foregoing discussion we conclude the Commissioner and hence the Trial Court was clearly in error in its finding that Katherine Furlow had a close relationship with Emmett James but that she did not live in open concubinage. We hold open concubinage was proven and Katherine Furlow has forfeited her right to permanent alimony. The judgment of the Trial Court is reversed; all costs are assessed to Katherine Furlow.
REVERSED.