| iLANDRIEU, Judge.
Jan Booth appeals a judgment which terminated the permanent alimony she was receiving from her- former husband, Bruce Samuels-. The district court found that Ms. Booth’s right to alimony ended, pursuant to the terms of the parties’ consent judgment, because she was living in open concubinage. We affirm.
In a Consent Judgment entered on January 31, 1995, Ms. Booth and Dr. Samuels agreed:
IT IS FURTHER ORDERED that upon entry of a judgment of divorce in this proceeding, BRUCE S. SAMUELS shall pay monthly post-divorce alimony to JAN BOOTH in an amount equal to $300 over the monthly mortgage payment on the Marcia Avenue residence, which is currently $2550 per month, and the post-divorce alimony shall increase or decrease in direct proportion to any increase or decrease in the mortgage payment If the mortgage and note are paid in full or if JAN BOOTH sells the Marcia Avenue residence, the amount of post-divorce alimony shall automatically be fixed in the amount of Twenty-eight Hundred fifty Dollars ($2,850.00) per month, without any action required by BRUCE S. SAMUELS. The postdivorce alimony payments shall become income taxable to JAN BOOTH and income tax *1039 deductible by BRUCE S. SAMUELS, shall not be subject to an increase or decrease under any circumstances, except as provided herein, and shall terminate upon death of either party, upon the remarriage of JAN BOOTH, or upon JAN BOOTH living in open concubinage. (Emphasis added.)
|20n January 16,1997, Dr. Samuels filed a Rule to Terminate Alimony, alleging that Ms. Booth was living in open concubinage with Mr. Bryce North at the Marcia Avenue home. Providing detailed reasons for judgment, the trial judge granted the Rule to Terminate Alimony, concluding that, based on the evidence presented, an open concubinage relationship did exist between Ms. Booth and Mr. North.
While “open concubinage” has not been defined by statute, our jurisprudence is helpful in determining the meaning of the phrase.[1] The trial court relied upon the case of Petty v. Petty, 560 So.2d 629 (La.App. 4th Cir.1990), which thoroughly discussed the development of the term “open concubinage.” Quoting Thomas v. Thomas, 440 So.2d 879, 881 (La.App. 2nd Cir.), writ denied, 443 So.2d 597 (La.1983), the Petty court stated:
... [Cjourts have historically insisted that a definite meaning be ascribed to both the words “open” and “concubinage,” before finding that the legal requisites of open concubinage have been proven.... [Cjoncubinage has retained the signification of a relationship in which a man and woman live together as husband and wife without being legally married.... [I]t depicts a status or relationship, rather than an act or series of acts. Concubinage is not constituted merely by acts of fornication or adultery, however frequent or even habitual.... [It] depicts a state of affairs in which the man and woman exercise with respect to each other the rights and privileges of marriage. Thus, concubinage could be defined as a relationship of sexual content in which man and woman live together as husband and wife in a state of affairs approximating marriage ... [Although living together is important to a finding of concubinage, it is not absolutely essential.
[Cjourts have also ascribed a definite and distinct meaning to the term “open.” Thus, it is not enough that concubinage be proven[,] ... concubinage [must] be “open.” Concubinage is said to be open, when the illicit relationship is not disguised, concealed, or |3made secret by the parties. Concubinage is open when the parties involved avow their illicit relationship by words or conduct. A finding of “openness” clearly does not require that the parties verbally acknowledge their illicit relationship[.] However, efforts taken by the parties to conceal their illicit relationship militates against a finding of openness. Moreover, it is not sufficient that an illicit relationship be “notorious” or widely known in order for it to be “open.” Openness constitutes a distinct and less easily achieved standard, involving the absence of any pretense or disguise which would provide a morally acceptable cloak for their illicit relationship. (Citations omitted.)
Petty, 560 So.2d at 630-31.
In Gray v. Gray, 451 So.2d 579, 584 (La.App. 2nd Cir.), writ denied, 457 So.2d 13 (La.1984), the court noted that openness does not require a person to refer explicitly to a concubine as a spouse; the requirement may be satisfied by the mere absence of concealment by the parties of the illicit relationship.
At issue in this appeal is whether the trial court clearly erred in concluding that the facts of this case comply with the judicial definition of “open concubinage.” At the hearing on the rule to terminate alimony, Ms. Booth stipulated that since March of 1995, over two years prior to the hearing, she and *1040 Mr. North had been “involved in a relationship involving regular, sexual relations.”
Ms. Booth testified that her two sons were very seldom present when Mr. North spent the night with her.[2] She said that Mr. North did not “come and go as he pleases” at her home, although he sometimes kept his dog at her house. She explained that the only reason Mr. North spent so much time at her house from August to December 1996 was that she had monthly episodes of malaria. Ms. Booth admitted that she had taken several trips with Mr. North as a couple, but she denied that she ever told anyone that Mr. North lived with her. Describing Mr. North’s attempts to conceal that he spent the night at her house, Ms. Booth 14said that he sometimes would exit through a back or side door and that his belongings were kept in a locked closet in her bedroom.
Dr. Samuels testified that he began noticing Mr. North’s car at his former home in the weeks after he and Ms. Booth separated in 1994, when he would pick up his sons from, or return them to, the house. He said he became suspicious when he .saw the car which he later discovered belonged to Mr. North at the house “99% of the time,” always saw Mr. North’s dog there, and was told by his sons about Ms. Booth’s vacations with Mr. North. He denied ever hearing about Ms. Booth’s illness.
Dorothy Cosey, the housekeeper for both Dr. Samuels and Ms. Booth, testified that she had no personal knowledge of Ms. Booth and Mr. North living together. She said that sometimes Mr. North was at Ms. Booth’s home when she arrived on the two mornings a week which she worked there; if not, he would arrive at lunchtime to eat alone. Ms. Cosey said that the guest bed was only slept in when Ms. Booth had visitors, not including Mr. North. She denied ever seeing clothes belonging to Mr. North and said that she never saw him leave from anywhere except the front door of the house. She recalled Ms. Booth being ill for four or five days in the fall of 1996.
Mr. North testified that he made every effort to conceal his sleeping at Ms. Booth’s home by sometimes leaving through the back door and that he did not pass himself off as her husband. He denied living at Ms. Booth’s house, saying that he has his own address. His driver’s license and several checks list an Orleans Avenue address for him. He also denied giving information to the health club at which he and Ms. Booth share a joint membership that .listed the Marcia Avenue residence as his address. He believes he and Ms. Booth have a normal dating relationship, and he does not want to get married.
|sThe last person to testify at the hearing was Norman Lowe, the private investigator hired by Dr. Samuels to conduct a random surveillance on the Marcia Avenue residence during November and December 1996. He observed Mr. North and his car at Ms. Booth’s home on numerous occasions. . His records indicate that on the three occasions that he chose to observe the house overnight, Mr. North spent the night at Ms. Booth’s home. On several other occasions, Mr. Lowe observed Mr. North at Ms. Booth’s home late at night and early the next morning. Mr. Lowe never saw Ms. Bopth looking ill, and he observed Mr. North always enter the house with a key, through the front door, and never with a suitcase or bag. Mr. North would always exit through the front door wearing clothes, different from the previous evening.
In determining that an open concubinage relationship existed between Ms. Booth and Mr. North, the trial judge reviewed the testimony:
Jan Booth stated that she and Bryce North have had a more than casual relationship for at least a year and a half. Surveillance was started in October 1996 and ended in March 1997. The private investigator testified that he observed Bryce North’s car on numerous occasions parked overnight in Jan Booth’s driveway. He further observed Bryce North entering Jan Booth’s home mostly in the evening through the door with his own key and *1041 leaving the next morning through the same front door wearing different clothes. Also, he testified that North’s dog is now living in the Booth home.
Jan Booth testified that Bryce North[,] when spending the night with her[,] would often sleep in the guest bedroom. The housekeeper stated that the guest bedroom was not used, unless Jan Booth’s family visited. The housekeeper also stated that the few times she saw Bryce North in Jan Booth’s house he always entered through the front door and would eat his lunch while she was there.
Jan Booth stated that she was sick from August 1996 through December 1996, however, her housekeeper testified that she recalls Jan Booth being ill only 4 or 5 days and not throughout the remaining months of the year as testified by Jan Booth. The evidence shows that Jan Booth used her health club membership throughout that period. The evidence further shows that the type of health club membership Jan booth applied for was a family membership. Jan Booth and Bryce North testified that this was done only for purposes of receiving a reduction in the membership fees relating to additional members. However, the additional member information relating to Bryce North is exactly the same as Jan Booth’s information. In addition, the emergency information listed Bryce North as the person |6to contact and the number given by Mr. North is the home phone number for Jan Booth.
Jan Booth testified that Mr. North has kept clothes at her home in the past. She testified that now he only keeps workout clothes at her home.
Jan Booth has two minor children who live with her. Bruce Samuels testified that when he visits with the children Bryce North’s automobile is usually there. He [has] also seen him in the house through a kitchen window and when he opens the door to let the children in or out.
The testimony further showed that Jan Booth and Bryce North took vacations together. It was known by her children and the housekeeper that she and Mr. North traveled together. His family was also aware that they traveled together and shared a room.
Ms. Booth’s assignments of error, which all are directed at the trial court’s factual findings, are that the trial court:
1. failed to address “open” and “concubinage” as two separate elements;
2. erred in finding the existence of open concubinage because she and Mr. North did not exercise any rights or privileges of marriage; and
3. failed to address the lack of openness of the relationship because she and Mr. North concealed their illicit relationship by their words and conduct.
Ms. Booth has presented no valid basis upon which to reverse the trial judge. Relying heavily on Petty, the trial judge at least implicitly found both “openness” and “concubinage.” The law requires nothing more.
Ms. Booth’s assertion that the trial court erred in apparently finding “openness” because she and Mr. North concealed their illicit relationship by their words and conduct is likewise without merit. Contrary to Ms. Booth’s assertion, there is no evidence, other than self-serving statements by Ms. Booth and Mr. North, to substantiate any effort to conceal their relationship at any time before Dr. Samuels filed the Rule to Terminate Alimony. Furthermore, the trial judge’s reasons for judgment are replete with credibility determinations to which we give great deference.
Ms. Booth further claims that the trial judge erred in finding open concubinage because she and Mr. North did not exercise any rights or privileges of marriage. The record shows otherwise. Ms. Booth and Mr. North had a two-tyear? relationship which, under the jurisprudence, was one which closely approximated marriage. The evidence regarding the health club membership, vacations together, amount of time Mr. North spent at Ms. Booth’s home, as well as his access to her home and that he apparently kept clothes and/or toiletries there, all combine to compel this conclusion.
Dr. Samuels’s reluctance to have his young sons testify is understandable. On the other *1042 hand, we find considerable conflict within Ms. Booth’s testimony, as well as between her testimony and her earlier deposition testimony. Her “malaria defense” is unconvincing because of her continuous visits to the health club and her planning a vacation during the time she was supposedly ill.
Overall, there has been no showing that the trial judge was manifestly wrong in her decision which found that Ms. Booth had forfeited her right to permanent alimony. The judgment is affirmed.

AFFIRMED.

. As of this year, the Louisiana Civil Code no longer uses the phrase "open concubinage” to identify a manner of extinguishment of the spousal support obligation. Instead, La. Civ. Code art. 115 requires "a judicial determination that the obligee has cohabited with another person of either sex in the manner of married persons.” According to Revision Comment (e), the new language means to live together in a sexual relationship of some permanence, it does not mean just acts of sexual intercourse, and it obviates the difficulties of proving absence of concealment inherent in the term "open concubi- ' nage.”

. The record indicates that the boys, the sons of Ms. Booth and Dr. Samuels, were approximately ages 10 and 13 in March of 1995 when the relationship between Ms. Booth and Mr. North presumably began. '