451 So.2d 579 (1984)
Cecil Thomas GRAY, JR., (Plaintiff-Appellant),
v.
Doris Patricia Barker GRAY, (Defendant-Appellee).
Nos. 15962-CA, 16211-CA.
Court of Appeal of Louisiana, Second Circuit.
April 30, 1984.
Rehearing Denied May 25, 1984.
*581 Nelson, Hammons & Johnson by John L. Hammons, Shreveport, for plaintiff-appellant.
Sockrider & Bolin by H.F. Sockrider, Jr., Shreveport, for defendant-appellee.
Before HALL, JASPER E. JONES and SEXTON, JJ.
SEXTON, Judge.
Plaintiff filed suit to terminate his obligation to pay permanent alimony to defendant on the grounds that defendant was living in open concubinage. Plaintiff additionally sought to terminate his alimentary obligation on the grounds that a change in his ex-wife's financial circumstances rendered his support unnecessary. The trial court rejected plaintiff's claims on both counts. We affirm.
Plaintiff in this cause is Cecil Thomas Gray, Jr., a former resident of Natchitoches, Louisiana. Defendant herein is Patricia Gray, Mr. Gray's former wife. These two parties were married on February 17, 1977, and were divorced by a judgment filed November 15, 1982. There were no children born of their marriage. The judgment of divorce ordered Cecil Gray to pay Patricia Gray permanent alimony at the rate of $500 per month.
On May 12, 1983, Cecil Gray filed a rule to terminate his obligation to pay permanent alimony to Patricia Gray, on the grounds that the "defendant in rule [Patricia Gray] [had] entered into open concubinage" with another man. The trial court rejected plaintiff's demand on May 25, 1983, finding that plaintiff had not proven open concubinage. The plaintiff appealed.
On July 14, 1983, plaintiff again filed a rule to terminate permanent alimony. Plaintiff again contended that the defendant, Patricia Gray, was living in open concubinage, and also asserted that she had experienced a change in her financial circumstances which rendered continued alimony unnecessary. The trial court rejected plaintiff's demand to terminate permanent alimony in a judgment rendered October 17, 1983, finding that plaintiff had proven neither open concubinage, nor a change in financial circumstances sufficient to justify a reduction or termination of permanent alimony. The plaintiff Cecil Gray has also appealed this judgment. The appeals of these two judgments are consolidated here.
The first issue to be addressed herein is whether the trial court erred in finding that the plaintiff had not proven that the defendant Patricia Gray was living in open concubinage with another man subsequent to the judicial dissolution of her marriage *582 to the plaintiff. The remaining issue is whether the trial court erred in finding that defendant Patricia Gray's financial circumstances had not changed sufficientlysince the judicial setting of permanent alimony to justify a reduction or termination of permanent alimony.

I.

Open Concubinage Claim
The definition of "open concubinage," as that term is employed in Article 160,[1] was presented as a matter of first impression to this Court in Thomas v. Thomas. This Court determined in Thomas that the term of "open concubinage" possesses the same meaning under Article 160 that it does under Civil Code Article 1481 which prohibits those living in open concubinage from donating immovable property to each other. Our adherence to the position articulated in Thomas is fundamentally based on the consideration that the term "open concubinage" has possessed a definitive legal meaning in Louisiana "for over a century,"[2] *583 and a judicial distortion or displacement of that meaning would constitute judicial legislation. We remain of the view that, having failed to supply a different term, the legislature simply did not desire or mandate that a different concept be operative in the termination of alimony.
"The term open concubinage has a well-established legal significance, and we believe that in employing this term, the legislature intended that it be accorded its traditional and firmly established meaning; had they intended otherwise, they could have employed a different precept which emphasized habitual sexual acts, rather than quasi-marital status." Thomas, supra, at 884.
The legal content of the term open concubinage was articulated in detail in Thomas:
[T]he courts have historically insisted that a definite meaning be ascribed to both the words "open" and "concubinage," before finding that the legal requisites of open concubinage have been proven. "Concubinage" is derived from the Latin term concubinatus. This term signified, in Roman civilization, a relationship or cohabitation in which the man and woman generally resided together as husband and wife without the benefit of the formalities, civil effects and legal consequences of a formal marriage. Succession of Jahraus, 114 La. 456, 38 So. 417 (1905). Thus to this day, concubinage has retained the signification of a relationship in which a man and woman live together as husband and wife without being legally married. Henderson v. Travelers Ins. Co., 354 So.2d 1031 (La. 1978); Succession of Moore, 232 La. 556, 94 So.2d 666 (1957); Succession of Franz, 232 La. 310, 94 So.2d 270 (1957); Succession of Jahraus, supra; Succession of Keuhling, 187 So.2d 520 (La.App. 3d Cir.1966); Purvis v. Purvis, 162 So. 239 (La.App. 2d Cir.1935). It is crucial to the definition of open concubinage to note that it depicts a status or relationship, rather than an act or series of acts. Succession of Moore, supra; Succession of Franz, supra; Succession of Jahraus, supra; Succession of Keuhling, supra. Concubinage is not constituted merely by "acts of fornication or adultery, however frequent or even habitual." Succession of Jahraus, 38 So. at 418. Moreover, "the concubine must not be confounded with the courtezan, or even with what is ordinarily called a mistress. She is the wife without a title." Gauff v. Johnson, 161 La. 975, 109 So. 782, 783 (1926). Concubinage depicts a state of affairs in which the man and woman exercise with respect to each other the rights and privileges of marriage. Succession of Lannes, 187 La. 17, 174 So. 94 (1936). Thus, concubinage could be defined as a relationship of sexual content in which man and woman live together as husband and wife in a state of affairs approximating marriage. It should be noted, however, that although living together is important to a finding of concubinage, it is not absolutely essential. Succession of Filhiol, 119 La. 998, 44 So. 843 (1907); Succession of Jahraus, supra; Succession of Keuhling, supra; Succession of Hamilton, 35 La. Ann. 640 (La.1883); Paxton v. Paxton, 173 So. 488 (La.App. 1st Cir.1937).
In applying the concept of "open concubinage," the Louisiana courts have also ascribed a definite and distinct meaning to the term "open." Thus, it is not enough that concubinage be proven. The courts have additionally required that concubinage be "open." Concubinage is said to be open, when the illicit relationship is not disguised, concealed, or made secret by the parties. Concubinage is open when the parties involved avow their illicit relationship by words or conduct. Succession of Keuhling, supra; Succession of Jahraus, supra; Paxton v. Paxton, supra. A finding of "openness" clearly does not require that the parties verbally acknowledge their illicit relationship: "[M]en of position do not proclaim from the housetops their *584 illicit connections." Succession of Filhiol, supra, 44 So. at 847. See also Jones v. Kyle, 168 La. 728, 123 So. 306 (1929); Succession of Jahraus, supra. However, efforts taken by the parties to conceal their illicit relationship militates against a finding of openness. Thomas, supra, at 881.
As indicated in Thomas, the requirement of openness does not require that a person explicitly refer to a concubine as a spouse; the requirement of openness may be satisfied by the mere absence of concealment, by the parties, of the illicit relationship.
Plaintiff's open concubinage allegation is centered upon the contention that the defendant Patricia Gray is presently living in open concubinage with Andrew Maggio. Patricia Gray was married to Andrew Maggio from 1954 until 1976. Four sons and one daughter were born of this marriage. At the time of trial, one of the sons was a minor, and the four remaining children were of the age of majority.
Plaintiff established that Patricia Gray currently lives in a home owned by Andrew Maggio at 605 Royal Street in Natchitoches. Moreover, Mr. Maggio pays the monthly note on said house, pays Mrs. Gray's grocery and utility bills, pays her insurance premiums, and provides her with an automobile and spending money. Mr. Maggio frequently eats at the house and keeps some of his clothes and toiletries there. Mr. Maggio periodically visits the household in the morning and at evening. It is uncontroverted that Mr. Maggio took a four day trip to Las Vegas with Mrs. Gray subsequent to her divorce from the plaintiff.
Plaintiff's claim that Patricia Gray was living in open concubinage with Andrew Maggio prior to trial was predicated principally upon the testimony of private investigator Howard Malpass. Plaintiff attempted to establish, through the testimony of Mr. Malpass, that Mr. Maggio frequently spent the night at the Royal Street residence. Mr. Malpass surveilled the Royal Street residence on several separate occasions in June of 1983. He testified as to Mr. Maggio's presence at the residence, and the written investigative report compiled by him on a day-by-day basis was also admitted into evidence.
Mr. Malpass's testimony indicates that on six of the seven occasions that Mr. Malpass "staked out" the Royal Street residence owned by Mr. Maggio, and occupied by Patricia Gray, Mr. Maggio spent the night at this residence. Mr. Malpass's testimony further reflects that the sole occasion during the surveillance period that Mr. Maggio did not stay at the Royal Street residence occurred on the night of June 15 when a sales representative for Mary Kay cosmetics spent the night there. Mr. Maggio reportedly stayed at his son's apartment on that occasion. Mr. Malpass accordingly concluded, in the written report admitted into evidence, that
"It is with out a doubt that MR. MAGGIO, and MRS. GRAY are indeed living with each other unless the time arises that for a Moral Standard such as the visit by the Mary Kay person comes, he will leave and stay somewhere else for the night. This has only been seen one time during the surveillance, by us."
Plaintiff attempted to corroborate the testimony of Howard Malpass with the testimony of Robert Bailey, an acquaintance of Cecil Gray, who conducted an informal surveillance of the Royal Street residence in January of 1983. Mr. Bailey testified that on every night between January 2 and January 6 of 1983, he observed one or more cars, registered under Mr. Maggio's name, located at the Royal Street residence shortly before or after midnight.
In attempting to rebut the plaintiff's testimony of open concubinage, defendant Patricia Gray presented testimony that she and Mr. Maggio had at no time lived together or even spent the night together since Mrs. Gray's divorce from the plaintiff, Cecil Gray. Mr. Maggio, Mrs. Gray, and three of their children unequivocally testified that Mr. Maggio moved out of the 605 Royal Street residence on January 1, 1983the same date that Mrs. Gray moved *585 inand has not resumed living there. It was thus their testimony that Mr. Maggio willingly vacated the house owned by him in order to provide a home for his former wife, and more especially his one minor son, Drew, of whom Patricia Gray had custody. Mr. Maggio testified that, after vacating his home on January 1, 1983, so that Mrs. Gray and Drew could occupy it, he lived in several different locations. He testified that he lived at 123 Second Street, at a house adjoining his produce company, from January of 1983 until June. In June and July he lived in the East Village Apartments with his major son, Greg, and on August 1, he began living at 1013 Marie Street with another adult son, Ralph. Mr. Maggio, Mrs. Gray, and the three children unequivocally testified that Mr. Maggio and Mrs. Gray had not lived together since Cecil Gray and Patricia Gray were divorced, and that the two had not spent the night together in that period.
Mr. Maggio and Mrs. Gray both testified that they spent their four day trip to Las Vegas with another couple, and slept in separate beds. Mr. Maggio admitted that he frequently visited the household at 605 Royal Street, but testified that these visits were made primarily to see his minor son, Drew, who was living with his mother, Patricia Gray. It is further clear that the Royal Street residence was a way station or central gathering place of sorts for Andrew Maggio's and Patricia Gray's four adult children, and that Andrew Maggio visited the household to spend time with his grown children as well. Moreover, the numerous vehicles and motor boat owned by Mr. Maggio were kept at the Royal Street residence since there was inadequate parking therefore at the various apartments resided in by Mr. Maggio. Thus, Mr. Maggio often went to the Royal Street residence to exchange vehicles with his children, or to pick up his van and boat for his frequent fishing expeditions.
Mr. Maggio readily admitted that he paid Mrs. Gray's living expenses. However, Mr. Maggio further testified in this regard that his largesse was rooted in a concern for the welfare of his minor son, Drew, and Patricia Gray, with whom Drew was living. His contention in this respect comports with the evidence of Patricia Gray's means and needs: Mrs. Gray was unemployed subsequent to her divorce from Cecil Gray. Moreover, she received alimentary support from Mr. Gray on a very sporadic basis, Mr. Gray being thrice adjudged in contempt of court for non-compliance with judicial orders of support.
The defendant presented rebuttal evidence for the specific instances that Mr. Malpass testified he had seen Mr. Maggio spending the night at the residence. This evidence cast doubt on the correctness of Mr. Malpass' observations. It appears, moreover, that Mr. Malpass was confused on several occasions during his surveillance as to the identity of Mr. Maggio and Mrs. Gray. With respect to the former, he apparently confused Mr. Maggio's oldest son with Mr. Maggio, and with respect to the latter, apparently mistook a neighbor for Mrs. Gray. Thus, the evidence was in conflict, and as the trial court stated, in evaluating the weight of Howard Malpass's testimony,
"there have been [too] many obvious cases of mistaken identity by Mr. Malpass to place any reliance on his testimony or his written report. Now we are not attacking Mr. Malpass's integrity, simply his improper identification.... Mr. Malpass has just made a number of mistakes in identifying Mr. Andrew Maggio."
Robert Bailey testified that vehicles registered to Andrew Maggio were seen late at night at the residence of Patricia Gray. However this testimony was countered by the defendant's showing that Andrew Maggio owns at least four vehicles all of which are frequently used by his daughter, sons, and his former wife, Patricia Gray. Moreover, Andrew Maggio continually alternated the vehicles used by him, using his vehicles interchangeably. It is significant in this context that Mr. Bailey expressly admitted, at trial, that he had not made late night sitings of Mr. Maggio himself at the *586 Royal Street residence, but had merely seen Mr. Maggio's vehicles.
Therefore, the trial court's evaluation of the evidence is supported by the record and is not to be disturbed by us absent a determination that the trial court evaluation is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Under the trial court's evaluation, it has not been shown that there was even one instance when Mr. Maggio spent the night. The record simply reflects that Mr. Maggio ate meals at 605 Royal Street and provided financial support to Patricia Gray and his minor son, Drew, who was entrusted to the custody of Patricia Gray. Thus the showing made does not comport with the standard of open concubinage we established in Thomas, supra.

II.

Change in Financial Circumstances
Plaintiff-appellant's other contention is that defendant's financial circumstances have changed sufficiently to justify a reduction or termination in permanent alimony.
Permanent alimony must be revoked if it becomes unnecessary to the ex-spouse/recipient. LSA-C.C. Art. 160. Thus, the spouse obligated to pay permanent alimony may seek a revocation of such alimony whenever changed circumstances in the financial posture of the payor and/or recipient justify a termination. Rains v. Rains, 376 So.2d 1298 (La.App. 2d Cir. 1979); Kees v. Kees, 292 So.2d 307 (La.App. 1st Cir.1974); Morace v. Morace, 220 So.2d 775 (La.App. 1st Cir.1969). An interrelated complex of statutory factors is utilized in determining the adequacy of, or lack of need for, a given level of permanent alimony. These relevant consideration have been broadly drawn and encompass the income, means, assets and earning capacity of the spouses, as well as their liabilities and obligations. LSA-C.C. Art. 160. Property, as well as income, is properly considered. Loyacano v. Loyacano, 358 So.2d 304 (La.1978); Smith v. Smith, 217 La. 646, 47 So.2d 32 (1950). In evaluating whether alimony is needed and therefore legally appropriate, the courts must examine the totality of circumstances indicative of both parties' financial condition. See Loyacano, supra.
If the husband's financial capability allows, the husband is obliged to ensure the maintenance of his ex-wife who has been found free of fault in the divorce proceeding. See Loyacano, supra, Ducote v. Ducote, 339 So.2d 835 (La.1976); Smith v. Smith, 217 La. 646, 47 So.2d 32 (1950); Meyers v. Meyers, 344 So.2d 451 (La.App. 2d Cir.1977). Maintenance, in this context, primarily connotes food, shelter and clothing. Smith, supra. However, more recent jurisprudence establishes that the concept of maintenance includes reasonable and necessary expenditures for an automobile or other transportation, utilities, household maintenance, and income tax. Loyacano, supra; Bernhardt v. Bernhardt, 283 So.2d 226 (La.1973); Meyers, supra. A spouse need not be destitute to qualify for permanent alimony. Loyacano, supra; Smith, supra; Smith v. Smith, 416 So.2d 134 (La.App. 2d Cir.1982). Moreover, she need not in all circumstances fully deplete her assets or sell her house in order to retain her alimentory eligibility. Loyacano, supra; Smith v. Smith, 217 La. 646, 47 So.2d 32 (1950); Rains, supra; Powell v. Powell, 344 So.2d 453 (La.App. 2d Cir. 1977); Loe v. Loe, 131 So.2d 106 (La.App. 2d Cir.1961).
In the final analysis, the permanent alimony determination is sensitive to all of the relevant facts of each case. See Loyacano, supra; Meyers, supra; Fisher v. Fisher, 320 So.2d 326 (La.App. 3d Cir. 1975). This determination is insusceptible of being reduced to a mathematical computation. The spouse seeking to change permanent alimony has the burden of proving that circumstances have sufficiently changed between the time of fixing of alimony and the hearing to modify or terminate, to justify a change. Loyacano, supra; Bernhardt, supra; Powell, supra; Fisher, supra; Morace, supra. The trial *587 court possesses broad discretion in making the alimony revocation determination, and its judgment will not be disturbed absent manifest abuse. Nicolle v. Nicolle, 308 So.2d 377 (La.App. 4th Cir.1975).
The principal change in financial circumstances alleged by plaintiff concerns the considerable financial support provided by Andrew Maggio to Patricia Gray. However, this largesse on the part of Andrew Maggio was motivated in part by Cecil Gray's persistent refusal to discharge his alimentary obligation to Patricia Gray, and the law is well settled that one party's legal obligation to pay alimony is not obviated by the gratuity of another. Shelton v. Shelton, 395 So.2d 899 (La.App. 2d Cir. 1981); McCole v. McCole, 383 So.2d 55 (La.App. 2d Cir.1980). Thus, Mr. Maggio's gratuitous support of Patricia Gray cannot, under these circumstances, justify a reduction or termination of permanent alimony.
Plaintiff also alleges that Patricia Gray is able to work. This assertion is supported by the record insofar as Patricia Gray admitted that, although she is bothered by osteo-arthritis, she is capable of part-time work. It is true, moreover, that an ex-wife's earning capacity is to be considered in assessing her entitlement to permanent alimony, and that an ex-wife who is reasonably equipped to work should do so. LSA-C.C. Art. 160. However, in seeking a reduction or termination of permanent alimony on the grounds that a change in financial circumstances has occurred, the party seeking the termination or reduction must establish a significant change or modification in the parties' circumstances since the time permanent alimony was last modified or set. Bernhardt v. Bernhardt, supra; Nash v. Nash, 431 So.2d 1090 (La.App. 3d Cir.1983); Bass v. Bass, 417 So.2d 67 (La.App. 3d Cir.1982); Blondeau v. Blondeau, 396 So.2d 403 (La.App. 1st Cir.1981); Howell v. Howell, 391 So.2d 1304 (La.App. 4th Cir.1980); Willis v. Willis, 355 So.2d 999 (La.App. 4th Cir.1978), writ denied, 356 So.2d 1389 (La.1978). See especially, McNeill v. McNeill, 223 So.2d 709 (La.App. 4th Cir.1969). Although plaintiff established that Patricia Gray is presently capable of employment, he did not establish that Patricia Gray was incapable of work at the time alimony was set. Thus, the fact that Patricia Gray is not presently workingunder the extant circumstances does not justify a reduction or termination of permanent alimony because the plaintiff simply has not proven a change in this regard.
In the final analysis, the trial court is vested with great discretion in making alimony determinations, and its rulings in that respect will not be disturbed absent a manifest abuse of discretion. Dugas v. Dugas, 428 So.2d 1059 (La.App. 1st Cir. 1983); Renfroe v. Renfroe, 428 So.2d 875 (La.App. 1st Cir.1983); Firstley v. Firstley, 427 So.2d 76 (La.App. 4th Cir.1983).
For the foregoing reasons, we conclude that plaintiff has not proven open concubinage or a change in financial circumstances legally sufficient to justify a reduction or termination of permanent alimony. The judgment of the trial court is therefore in all respects affirmed, the costs of this appeal to be assessed to plaintiff-appellant.
AFFIRMED.
NOTES
[1] As we noted in Thomas v. Thomas, 440 So.2d 879, at 884, note 2 (La.App. 2d Cir.1983), there were two versions of Article 160 enacted by the Legislature in 1982. Only that enacted by Act 580 of 1982 terminated permanent alimony upon a finding of open concubinage. Here as there, we believe the correct statutory version is that embodied in Act 580.

The version of Article 160 enacted by Act No. 293 of 1982 provides that:
A. When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, permanent periodic alimony which shall not exceed one-third of his or her income. Alimony shall not be denied on the ground that one spouse obtained a valid divorce from the other spouse in a court of another state or country which had no jurisdiction over the person of the claimant spouse.
In determining the entitlement and amount of alimony after divorce, the court shall consider the income, means, and assets of the spouses; the liquidity of such assets; the financial obligations of the spouses, including their earning capacity; the effect of custody of children of the marriage upon the spouse's earning capacity; the time necessary for the recipient to acquire appropriate education, training, or employment; the health and age of the parties and their obligations to support or care for dependent children; and any other circumstances that the court deems relevant.
In determining whether the claimant spouse is entitled to alimony, the court shall consider his or her earning capability, in light of all other circumstances.
Permanent periodic alimony shall be revoked if it becomes unnecessary and terminates if the spouse to whom it has been awarded remarries.
B. The court may award alimony in lump sum in lieu of or in combination with permanent periodic alimony when circumstances require it or make it advisable, and the parties consent thereto. In determining whether to award lump sum alimony, the court shall consider the needs of the claimant spouse and the financial condition of the paying spouse. In awarding lump sum alimony in lieu of or in combination with permanent periodic alimony, the court shall consider the criteria enumerated in paragraph A of this article, except the limitation to one-third of the paying spouse's income, in determining entitlement and amount of alimony.
A lump sum award may consist of immovable or movable property or may be a monetary award payable in one payment or in installments.
The later enacted version of Article 160 enacted by Act No. 580 of 1982, and relied upon by this court, reads as follows:
When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, alimony which shall not exceed one-third of his or her income. Alimony shall not be denied on the ground that one spouse obtained a valid divorce from the other spouse in a court of another state or country which had no jurisdiction over the person of the claimant spouse. In determining the entitlement and amount of alimony after divorce, the court shall consider the income, means, and assets of the spouses; the liquidity of such assets; the financial obligations of the spouses, including their earning capacity; the effect of custody of children of the marriage upon the spouse's earning capacity; the time necessary for the recipient to acquire appropriate education, training or employment; the health and age of the parties and their obligations to support or care for dependent children; any other circumstances that the court deems relevant.
In determining whether the claimant spouse is entitled to alimony, the court shall consider his or her earning capacity, in light of all other circumstances.
This alimony shall be revoked if it becomes unnecessary and terminates if the spouse to whom it has been awarded remarries or enters into open concubinage. (Emphasis added.)
[2] Thomas v. Thomas, 440 So.2d 879, 880-81 (La.App. 2d Cir.1983).