440 So.2d 879 (1983)
J. Merlin THOMAS, Plaintiff-Appellant,
v.
Urslia P. THOMAS, Defendant-Appellee.
No. 15695-CA.
Court of Appeal of Louisiana, Second Circuit.
October 24, 1983.
Writ Denied December 16, 1983.
*880 Kidd & Kidd by Paul Henry Kidd, Monroe, for plaintiff-appellant.
McLeod, Swearingen, Verlander & Dollar by Robert P. McLeod, Monroe, for defendant-appellee.
Before MARVIN, FRED W. JONES, Jr. and SEXTON, JJ.
SEXTON, Judge.
Plaintiff sued to terminate his obligation to pay permanent alimony, based upon his ex-wife's alleged open concubinage. The trial court found that plaintiff's ex-wife was not living in open concubinage, and dismissed plaintiff's claim. We affirm.
Plaintiff, J. Merlin Thomas, and defendant, Urslia Thomas, who both reside in Bastrop, were divorced by a judgment rendered on June 2, 1981. The judgment of divorce specifically found Urslia Thomas free of fault, and ordered Merlin Thomas to pay her permanent alimony in the amount of $100 per month. No children were born of the marriage.
On January 7, 1983, plaintiff Merlin Thomas filed a rule to terminate his obligation to pay permanent alimony on the grounds that Urslia Thomas was living in open concubinage with another man. The trial court concluded that defendant Urslia Thomas was not living in open concubinage with another man, and in an opinion rendered from the bench on February 15, 1983, dismissed plaintiff's motion to terminate permanent alimony.
The issue on appeal is whether the trial court erred in concluding that defendant Urslia Thomas was not living in open concubinage.
The statutory basis of plaintiff's motion to terminate permanent alimony is Civil Code Article 160, as newly amended by Act 580 of 1982. The new amendment to Article 160 provides that permanent alimony "terminates if the spouse to whom it has been awarded remarries or enters into open concubinage." Thus, for the first time in Louisiana's legal history, open concubinage on the part of an ex-spouse terminates his or her right to permanent alimony. To our knowledge, this appeal represents the first decision in which the new open concubinage provision of Article 160 has been interpreted. Moreover, Article 160 itself does not define the term "open concubinage."
In considering the term "open concubinage," however, this Court is not operating in a legal vacuum. The term open concubinage is used in Civil Code Article 1481, which states in pertinent part that, "Those who have lived together in open concubinage are respectively incapable of making to each other ... any donation of immovables." Moreover, the jurisprudence has for *881 over a century ascribed a definitive meaning to the term "open concubinage."
It is our view that the definition of "open concubinage" operative in the jurisprudence interpreting Article 1481 is equally applicable in the interpretation of Article 160. In short, open concubinage has the same meaning under Article 160 as it does Article 1481. When a legislature utilizes a term with a well-known meaning, it is logical to conclude that they intend the term to convey the same meaning which has become inextricably intertwined with the term itself.
In defining and applying the term open concubinage, the courts have historically insisted that a definite meaning be ascribed to both the words "open" and "concubinage," before finding that the legal requisites of open concubinage have been proven. "Concubinage" is derived from the Latin term concubinatus. This term signified, in Roman civilization, a relationship or cohabitation in which the man and woman generally resided together as husband and wife without the benefit of the formalities, civil effects and legal consequences of a formal marriage. Succession of Jahraus, 114 La. 456, 38 So. 417 (1905). Thus to this day, concubinage has retained the signification of a relationship in which a man and woman live together as husband and wife without being legally married. Henderson v. Travelers Ins. Co., 354 So.2d 1031 (La. 1978); Succession of Moore, 232 La. 556, 94 So.2d 666 (1957); Succession of Franz, 232 La. 310, 94 So.2d 270 (1957); Succession of Jahraus, supra; Succession of Keuhling, 187 So.2d 520 (La.App. 3d Cir.1966); Purvis v. Purvis, 162 So. 239 (La.App. 2d Cir.1935). It is crucial to the definition of open concubinage to note that it depicts a status or relationship, rather than an act or series of acts. Succession of Moore, supra; Succession of Franz, supra; Succession of Jahraus, supra; Succession of Keuhling, supra. Concubinage is not constituted merely by "acts of fornication or adultery, however frequent or even habitual." Succession of Jahraus, 38 So. at 418. Moreover, "the concubine must not be confounded with the courtezan, or even with what is ordinarily called a mistress. She is the wife without a title." Gauff v. Johnson, 161 La. 975, 109 So. 782, 783 (1926). Concubinage depicts a state of affairs in which the man and woman exercise with respect to each other the rights and privileges of marriage. Succession of Lannes, 187 La. 17, 174 So. 94 (1936). Thus, concubinage could be defined as a relationship of sexual content in which man and woman live together as husband and wife in a state of affairs approximating marriage. It should be noted, however, that although living together is important to a finding of concubinage, it is not absolutely essential. Succession of Filhiol, 119 La. 998, 44 So. 843 (1907); Succession of Jahraus, supra; Succession of Keuhling, supra; Succession of Hamilton, 35 La.Ann. 640 (La.1883); Paxton v. Paxton, 173 So. 488 (La.App. 1st Cir.1937).
In applying the concept of "open concubinage," the Louisiana courts have also ascribed a definite and distinct meaning to the term "open." Thus, it is not enough that concubinage be proven. The courts have additionally required that concubinage be "open." Concubinage is said to be open, when the illicit relationship is not disguised, concealed, or made secret by the parties. Concubinage is open when the parties involved avow their illicit relationship by words or conduct. Succession of Keuhling, supra. Succession of Jahraus, supra; Succession of Keuhling, supra; Paxton v. Paxton, supra. A finding of "openness" clearly does not require that the parties verbally acknowledge their illicit relationship: "[M]en of position do not proclaim from the housetops their illicit connections." Succession of Filhiol, supra, 44 So. at 847. See also Jones v. Kyle, 168 La. 728, 123 So. 306 (1929); Succession of Jahraus, supra. However, efforts taken by the parties to conceal their illicit relationship militates against a finding of openness. Moreover, it is not sufficient that an illicit relationship be "notorious" or widely known in order for it to be "open." Succession of Jahraus, supra; Succession of Keuhling, supra. Openness constitutes a distinct and less easily *882 achieved standard, involving the absence of any pretense or disguise which would provide a morally acceptable cloak for their illicit relationship.
Urslia Thomas, at the time of trial, was 54 years old. Ray Rachell, with whom she was allegedly living in open concubinage, was 52 years of age. Ms. Thomas lives in a two bedroom house in Bastrop and Mr. Rachell maintains a residence at a rented trailer in nearby Crossett, Arkansas.
The testimony of Merlin Thomaswho conducted regular surveillance of his ex-wife's house and compiled detailed notes of his day-by-day observationsindicates that Ray Rachell spent the night at Ms. Thomas' home about 85 percent of the nights between October 22, 1982 and the date of trial on February 15, 1983. There were several periods of three to four days apiece during that nearly four month span that Ray Rachell or the vehicle driven by him was not sighted late at night and early in the morning at Urslia Thomas' home. However, the testimony reflects that during these infrequent absences by Ray Rachell from Ms. Thomas' home, Ms. Thomas herself was not at home. On several of these occasions, Ms. Thomas was spotted either in Crossett, or on the road between Bastrop and Crossett. Moreover, Ms. Thomas and Mr. Rachell were often sighted returning to her house together or in separate vehicles at closely intervening times, subsequent to these absences.
Neither Ray Rachell nor Ms. Thomas denied that he was a frequent overnight guest at Ms. Thomas' Bastrop home, and Mrs. Thomas admitted the day of the trial that he had in fact spent the previous night at her house.
There were three other persons that resided at Ms. Thomas' home during most of the four month period preceding trial. These were Ms. Thomas' 33 year old son, Freddie Bryan, Ms. Thomas' aged and ailing mother, and a young woman named Sheila Wade who was paid to look after Ms. Thomas' mother, and who Freddie Bryan referred to as a girlfriend. Defendant, her son, and Sheila Wade testified that Ms. Thomas and her mother slept in one bedroom, that Ray Rachell slept in the other bedroom, and that Sheila Wade and Freddie Bryan slept in the living room on a couch and roll away mattress, respectively. Both Ms. Thomas and Ray Rachell denied having sexual relations, or ever sleeping with each other. However, Ms. Thomas referred to Ray Rachell as a "close friend" and a "boyfriend." Ray Rachell admitted that he was "dating" Ms. Thomas, and the trial court found as a fact that the parties' relationship included sexual relations. It appears, moreover, that during the four month period here at issue, Ms. Thomas and Ray Rachell dated each other exclusively.
Several other facts are important in assessing the character of the parties' relationship. Ray Rachell maintains a separate residence in Crossett, Arkansas. With the exception of a suit of clothes which he sometimes leaves at Ms. Thomas' Bastrop residence, it appears that he does not keep his clothes at the Thomas residence. He does not keep his toiletries there, but carries his shaving kit with him when he comes over. Mr. Rachell generally goes by his trailer every day after work to shower and change clothes before going to Urslia Thomas' house to spend the night, and rarely stays at her house more than one night without stopping at his trailer to "put on a clean change of clothes and check [the] mailbox." Ray Rachell helps Urslia Thomas cook, helps pay for groceries, "double dates" with her and a couple with whom they are acquainted, and Urslia Thomas has introduced him to at least one other party as her "boyfriend." Mr. Rachell ate Christmas dinner at the Thomas house, and opened presents with the residents there. He does not help pay the utility bills incurred at the Thomas home, and there is no evidence that he assisted Urslia Thomas in paying rent or house notes.
We conclude that the trial court did not err in finding that Urslia Thomas and Ray Rachell were not living in open concubinage between October of 1982 and February of 1983. The evidence preponderates that Ms. Thomas and Mr. Rachell have sustained a *883 habitual relationship of sexual content during that period of time. Indeed, the facts of this relationship present a difficult case and, in time, their relationship might develop into one of verifiable concubinage. Moreover, the distinction between the sustained sexual relations of two people, such as is presented here, and open concubinage, is somewhat elusive and not easily articulable.
However, the classic definition of concubinage as living together as man and wife absent the sanction of legal marriage has been consistently reaffirmed in the Louisiana courts through the present time. We believe that, in view of the totality of circumstances of the sustained relationship of Rachell and Ms. Thomas, their relationship approachedwithout becomingopen concubinage. We encounter little difficulty in finding that the parties' relationship was "open" since no shams or pretenses were indulged to conceal the sexual content of the parties' relationship. However, we concur in the trial court's finding that the parties' relationship did not constitute concubinage.
Several considerations factor into this determination. It is extremely crucial, in the first instance, that the parties maintained separate residences. This fact is not in and of itself fatal to a finding of concubinage. It is, however, very persuasive. Moreover, Ray Rachell did not keep his clothes or toilet articles at Ms. Thomas' house, nor does the record indicate that he helped pay for utilities or rental payments. Nor did he welcome her into his own home as a "common law" wife. These factors are merely quantifiable indicia of the larger phenomena, however. What is crucial is that, taken as a whole, their relationship does not indicate that they were living together as man and wife, or setting up a household together, or sharing a fully common life. The evidence indicates, to the contrary, that by perhaps the barest of margins, Rachell and Ms. Thomas maintained enough "separateness" in their lives to distinguish their relationship from a relationship of concubinage. The subtle distinction operative here is that articulated in the leading case of Jahraus: concubinage connotes not acts of sexual intercourse, no matter how frequent or even habitual, but a status or relationship of living together as man and wife absent the lawful sanction of marriage. Simply stated, plaintiff's proof has not crossed the elusive threshold between habitual relations and concubinage.
We parenthetically note the astute argument of plaintiff's counsel that the legal content ascribed to the term "open concubinage," as it appears in Article 160, should be different than the content ascribed to that term as it is employed in Article 1481. Plaintiff's argument is that the "open concubinage" requirement serves different policy objectives in Article 1481 than it does in Article 160. Whereas open concubinage under Article 160 terminates one's right to permanent alimony, open concubinage under Article 1481[1] greatly restricts one's right to receive donations from one with whom they have lived in open concubinage. Plaintiff argues that less absolute proof and a broader, more easily established standard of open concubinage is appropriate under Article 160, since the openness requirement of Article 1481 was incorporated to reduce inquisition into the lives of the dead who are unable to defend their honor. Plaintiff argues that less stringent proof should be required in proving open concubinage under Article 160, because, by definition, the one against whom proceedings are brought is still living (and collecting permanent alimony), and therefore able to defend himself.
We are unable to accept plaintiff's contention that a less stringent standard of proof, and a less constant relationship should be required in establishing open concubinage *884 under Article 160 than under 1481. The term open concubinage has a well-established legal significance, and we believe that in employing this term, the legislature intended that it be accorded its traditional and firmly established meaning; had they intended otherwise, they could have employed a different precept which emphasized habitual sexual acts, rather than quasi-marital status.
We note also that the last paragraph of Article 160 terminates an ex-spouse's right to permanent alimony upon his or her open concubinage or remarriage. Given this context, we believe that open concubinage connotes a quasi-marital relationship. We conclude, more specifically, that the legislature intended to provide for circumstances in which an ex-spouse might evade the spirit of the law by assuming a relationship which was marital in every respect save legal sanction, and thereby retain the right to permanent alimony. In short, the new amendment prevents ex-spouses from adopting ploys in which they share a connubial relationship, and yet salvage their right to permanent alimony by eschewing marriage. An interpretation of "open concubinage" as a quasi-marital status or relationship is wholly consistent with this common sense construction of the purpose behind Article 160.[2]
*885 For the foregoing reasons, we concur in the trial court's finding that Urslia Thomas was not living in open concubinage. We accordingly affirm the trial court's judgment in declining to terminate the plaintiff's obligation to pay permanent alimony. All costs of this appeal are assessed to plaintiff-appellant.
AFFIRMED.
NOTES
[1] Civil Code Article 1481, reads as follows:

Art. 1481. Invalidity of donations between persons living in concubinage; exceptions.
Those who have lived together in open concubinage are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it can not exceed one-tenth part of the whole value of their estate.
[2] The statutory law governing the right to permanent alimony is in a precarious posture presently, there being two versions of Article 160 which are currently enacted into law. The first version of Article 160 was enacted by Act 293 of 1982, and the second version was enacted by Act 580 of 1982. Thus, two versions of Article 160 were enacted in the same year; neither has been repealed. Both versions of Article 160 have been codified in the Revised Statutes under the authority of LSA-R.S. 24:253. Only the version of Article 160 enacted by Act 580 terminates permanent alimony upon a finding of open concubinage. We have assumed, for the purposes of this opinion, that the later enacted version of Article 160, is in effect. Therefore, the statutory analysis contained in this opinion is predicated upon that version of Article 160 enacted by Act 580, which version does terminate an ex-spouse's right to permanent alimony upon a finding of open concubinage.

The version of Article 160 enacted by Act No. 293 of 1982 provides that:
A. When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, permanent periodic alimony which shall not exceed one-third of his or her income. Alimony shall not be denied on the ground that one spouse obtained a valid divorce from the other spouse in a court of another state or country which had no jurisdiction over the person of the claimant spouse.
In determining the entitlement and amount of alimony after divorce, the court shall consider the income, means, and assets of the spouses; the liquidity of such assets; the financial obligations of the spouses, including their earning capacity; the effect of custody of children of the marriage upon the spouse's earning capacity; the time necessary for the recipient to acquire appropriate education, training, or employment; the health and age of the parties and their obligations to support or care for dependent children; and any other circumstances that the court deems relevant.
In determining whether the claimant spouse is entitled to alimony, the court shall consider his or her earning capability, in light of all other circumstances.
Permanent periodic alimony shall be revoked if it becomes unnecessary and terminates if the spouse to whom it has been awarded remarries.
B. The court may award alimony in lump sum in lieu of or in combination with permanent periodic alimony when circumstances require it or make it advisable, and the parties consent thereto. In determining whether to award lump sum alimony, the court shall consider the needs of the claimant spouse and the financial condition of the paying spouse. In awarding lump sum alimony in lieu of or in combination with permanent periodic alimony, the court shall consider the criteria enumerated in paragraph A of this article, except the limitation to one-third of the paying spouse's income, in determining entitlement and amount of alimony.
A lump sum award may consist of immovable or immovable property or may be a monetary award payable in one payment or in installments.
The later enacted version of Article 160 enacted by Act No. 580 of 1982, and relied upon by this court, reads as follows:
When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, alimony which shall not exceed one-third of his or her income. Alimony shall not be denied on the ground that one spouse obtained a valid divorce from the other spouse in a court of another state or country which had no jurisdiction over the person of the claimant spouse. In determining the entitlement and amount of alimony after divorce, the court shall consider the income, means, and assets of the spouses; the liquidity of such assets; the financial obligations of the spouses, including their earning capacity; the effect of custody of children of the marriage upon the spouse's earning capacity; the time necessary for the recipient to acquire appropriate education, training or employment; the health and age of the parties and their obligations to support or care for dependent children; any other circumstances that the court deems relevant.
In determining whether the claimant spouse is entitled to alimony, the court shall consider his or her earning capacity, in light of all other circumstances.
This alimony shall be revoked if it becomes unnecessary and terminates if the spouse to whom it has been awarded remarries or enters into open concubinage. (Emphasis added.)