MARVIN, Chief Judge.
George L. Scott, Jr. appeals a permanent alimony award of $120 per month made to his ex-wife eight years after their 1982 legal separation and three years after their 1987 divorce.
He contends Mrs. Scott has forfeited her right to claim permanent alimony by not seeking it or reserving her right to later claim it in the divorce action and by living in open concubinage with other men since 1985.[1]
Mr. Scott also argues that Mrs. Scott has had sufficient time to acquire education, training or employment to support herself, and that she has not shown a change in circumstances after the judgments of separation and divorce, which contained no alimony provisions.
We affirm.
PRIOR JUDGMENTS; CHANGE IN CIRCUMSTANCES
Mrs. Scott did not seek alimony pen-dente lite in her action for a legal separation which was. founded on Mr. Scott’s fault. Mr. Scott obtained the 1987 divorce judgment by default on allegations that the parties had not reconciled or lived together after the 1982 separation. Mrs. Scott’s rule for permanent alimony was filed before January 1, 1991, the effective date of Act 521 of 1990, which broadened civil law res judicata to issue-preclusion recognized in many common law jurisdictions.
Neither her failure to seek pre-divorce alimony nor the fact that she could have sought permanent alimony in the divorce action bars Mrs. Scott’s right to claim post-divorce permanent alimony. See and compare Dubourg v. Dubourg, 291 So.2d 441 (La.App. 4th Cir.1974) and McDonald v. McDonald, 516 So.2d 1306 (La.App.2d Cir.1987).
Mrs. Scott’s “need” for alimony, whether pendente lite or permanent, was not previously adjudicated, and she is not seeking to modify a prior alimony award. The silence of the separation and divorce judgments as to alimony does not amount to a denial of alimony or trigger the “change in circumstances” requirement of LRS 9:311. See and compare Arender v. Houston, 540 So.2d 439 (La.App. 1st Cir.1989) and White v. White, 356 So.2d 1023 (La.App. 1st Cir.1977).
OTHER ARGUMENTS
Under former CC Art. 160, redesignated as Art. 112 after Mrs. Scott’s rule for alimony was tried, the entitlement to and amount of permanent alimony is determined in part by “the time necessary for the recipient to acquire appropriate education, training, or employment.” This article further provides that permanent alimony “terminates if the spouse to whom it has been awarded remarries or enters into open concubinage.”
Mr. Scott contends, as he did below, that either or both provisions of Art. 160 bar Mrs. Scott’s claim for permanent alimony that was made for the first time some eight years after legal separation and three years after divorce.
OPEN CONCUBINAGE
Mrs.- Scott had several boyfriends after she and Mr. Scott separated. Mr. Scott and his sister testified that Mrs. Scott lived with Dexter Davis from 1985-1988, “just like they were married.” Mr. Scott said Dexter Davis kept his clothes at Mrs. Scott’s house and was “domiciled” there. Davis said he kept some of his clothes there but that he “was never moved in.” He said Mrs. Scott would introduce him as her “friend,” not as her husband or future husband.
Both Mrs. Scott and Davis admitted spending nights together at her home, but denied that they were “living together.” Davis said he was “seeing” another woman at the same time and was living with his mother.
*1096 The Scotts’ 18-year-old son, Darius, said Davis spent the night with Mrs. Scott “between 50% and ... 65% of the time” and corroborated Davis’s testimony that he stayed with his mother the rest of the time. Mrs. Scott and the other witnesses testified that she did not try to hide the fact that Davis was sometimes spending nights at her home.
Allen Devoil spent nights at Mrs. Scott’s house for about a year in 1988-1989. Mrs. Scott spent nights at Charles Burden’s place at some unspecified time but said he never spent the night at her place.
Darius Scott said Davis and Devoil kept some of their clothes at Mrs. Scott’s house but that neither one kept all of his clothes, toilet articles and other belongings there. Darius said his mother called Davis and Devoil her “boyfriends” and never said “this was her husband or they were going to marry or something like that.” According to Darius, his mother’s relationship with each of her boyfriends was not “the same type relationship that she had with [Mr. Scott] before they split up ...”
On this conflicting testimony, the trial court found that Mrs. Scott did not live in open concubinage with other men. Mr. Scott contends this finding is clearly wrong because Davis and Devoil ate, slept and kept clothes at Mrs. Scott’s house and she did not try to hide the fact that they spent nights with her. While the evidence clearly shows that these relationships were “open” and allows the reasonable inference that the relationships were sexual, this evidence does not prove “concubinage,” the “status or relationship of living together as man and wife ... in a state of affairs approximating marriage.” Thomas v. Thomas, 440 So.2d 879 (La.App.2d Cir.1983), writ denied.
Here the trial court made the “elusive distinction” between habitual sexual relations, which do not terminate the right to permanent alimony, and open concubinage, which does terminate that right, that we recognized in Thomas, supra.
The testimony of Mrs. Scott and her witnesses conflicted with the testimony of Mr. Scott and his witnesses, but was not internally inconsistent or facially implausible. Obviously assigning greater weight and credibility to Mrs. Scott and her witnesses and making the Thomas distinction, the trial court found that Mrs. Scott’s relationships with other men did not amount to open concubinage. Under the circumstances of this record, we cannot, and do not, disturb this factual finding. Rosell v. ESCO, 549 So.2d 840 (La.1989).
MRS. SCOTT’S FINANCIAL CIRCUMSTANCES
In addition to their son, Darius, Mr. and Mrs. Scott have two daughters, now ages 12 and 10. Mrs. Scott has had legal custody of the children since she and Mr. Scott separated in 1981. The daughters have always lived with her. Darius lived with Mrs. Scott until December 1989, when he began living with his paternal aunt.
Mrs. Scott receives $500 per month in child support from Mr. Scott and $208 per month in food stamps for the children. She was not working when she and Mr. Scott separated. She explained that she did not work regularly after the separation, saying
The last time I worked was in 1985 at the Western Sizzlin Steak House and I left there because of my sickness.... I have been shot three times, shot me in my chest and in my side and in my back and I have a bullet in my back right now right next to my spinal ... and it can’t be removed. If it do, they say it might paralyze me.
Mrs. Scott did not say when or by whom she was shot, or otherwise describe her “sickness” or its effect on her ability to work.
About six months before the alimony hearing, Mrs. Scott began working as a grocery cashier in Bastrop. She works about 20 hours a week, earning $240 per month, with no tax or other monthly deductions. She lists $757 in monthly expenses for herself. She said she “did the best she could” to support herself and the children with the child support and food stamps when she was not working. She denied that Dexter Davis supported her or that *1097 she supported him, during their relationship, which ended in 1988.
Mr. Scott is a boiler room mechanic at a paper mill in Crossett, Arkansas. He earns about $2,800 per month gross and $2,008 net, with listed expenses of $2,028. He was ordered to pay Mrs. Scott $120 monthly alimony.
Mr. Scott contends no award should have been made because Mrs. Scott is now employed and has had time to acquire appropriate education, training or employment to support herself during the years after the 1982 legal separation and the 1987 divorce. Mr. Scott did not ask about, and Mrs. Scott did not state, her educational background or her earning potential.
Mrs. Scott’s employment and employability are relevant under former CC Art. 160, as is her health and the fact that she has had custody of the minor children since 1981. Her income is less than one-third her expenses, which are not challenged as excessive by Mr. Scott. She was not asked why she only works part-time, whether because of her “sickness,” her desire to spend time with her children, or any other reason. We also have no evidence in the record to suggest that Mrs. Scott is capable of earning more than the minimum wage she presently earns, or that she has, but is not using, education or vocational training which would enable her to earn enough to support herself. Compare factually Johnson v. Johnson, 442 So.2d 901 (La.App.3d Cir.1983), writ denied, and Siciliani v. Siciliani, 552 So.2d 560 (La.App.2d Cir.1989), writ denied.
CONCLUSION
While it is theoretically possible that Mrs. Scott has had time to become self-supporting, as Mr. Scott argues, he did not present, in the record before us, sufficient facts that would allow us to make the arguable conclusion.
In this record we find no error or abuse of discretion in the trial court’s weighing of the Art. 160 factors and awarding Mrs. Scott $120 per month in permanent alimony.
DECREE
At Mr. Scott’s cost, the judgment is AFFIRMED.

. Mr. Scott does not contend that Mrs. Scott was at fault for the separation or the divorce, notwithstanding that she had a boyfriend and frequently spent the night with him for about two years before she and Mr. Scott were divorced. Compare Stears v. Stears, 569 So.2d 220 (La.App. 1st Cir.1990) and cases cited therein at p. 222.