596 So.2d 1384 (1992)
David McMAHON
v.
LOUISIANA INSURANCE GUARANTY ASSOCIATION.
No. CA 91 0049.
Court of Appeal of Louisiana, First Circuit.
March 6, 1992.
Rehearing Denied May 6, 1992.
*1386 Jack M. Dampf, Broussard & Dampf, Baton Rouge, for plaintiff-appellee David McMahon.
Henry G. Terhoeve, Baton Rouge, for defendant-appellant Louisiana Ins. Guar. Ass'n.
Before WATKINS, CARTER and FOIL, JJ.
FOIL, Judge.
At issue in this appeal is whether the insured, a Louisiana corporation, is a "resident" of the State of Louisiana for the purpose of determining whether the plaintiff's claim is a "covered claim" under the scope of the Louisiana Guaranty Law and if so, whether the Louisiana Insurance Guaranty Association (LIGA) is entitled to credits for various amounts of money received by the claimant and his spouse to offset its liability. We hold that a Louisiana corporation which is conducting business in this state is a "resident" of Louisiana, subjecting LIGA to liability on this covered claim, and deny LIGA's demands for credits against that liability. We affirm the trial court.

FACTS
On March 13, 1984, David McMahon was injured in a rear-end collision occurring in Philadelphia, Pennsylvania, when the vehicle in which he was riding was struck from behind by a tractor-trailer rig driven by Frances Teter. At the time of the accident, Ms. Teter, who is not a Louisiana resident or domiciliary, was in the course and scope of her employment by Caravan Refrigerated Cargo, Inc. (Caravan). Mr. McMahon filed a tort suit in a federal district court in Pennsylvania against Caravan and Frances Teter, and obtained a default judgment against both defendants on November 23, 1987, in the amount $1,865,000.00. The judge found that Mr. McMahon was totally and permanently disabled because of the accident, which was caused by the negligence of Frances Teter, and apportioned damages as follows: $500,000.00 for past and future wage loss; $365,000.00 for past and future medical expenses, and $1,000,000.00 for pain and suffering.
At the time of the accident, Caravan was insured by Carriers Insurance Company. In January of 1986, Carriers, an admitted company within the scope of the Louisiana Guaranty Law, was declared insolvent. Mr. McMahon filed the present action in the 19th Judicial District Court for the Parish of East Baton Rouge, seeking to enforce his Pennsylvania judgment against LIGA. He argued that his claim is a "covered claim" within the scope of the Louisiana Guaranty Law because Caravan, a Louisiana corporation, was a "resident" of Louisiana at the time of the accident. LIGA denied liability, asserting that Mr. McMahon's claim is not a "covered claim" because Caravan was a resident of either *1387 Texas or California, and therefore, the claim is not covered because the claimant and the insured are residents of states other than Louisiana. Alternatively, LIGA sought credits for sums of money received by Mr. McMahon and his wife in payment or settlement of their claims arising out of the accident.
The record shows that Mr. McMahon received $40,000.00 in uninsured motorist benefits from his own insurance carrier and the insurer of the vehicle in which he was riding. Additionally, he received weekly worker's compensation benefits since the date of the accident. Mr. McMahon also filed suit against the Texas Property and Casualty Advisory Association (Texas' Guaranty Association) and the Pennsylvania Insurance Guaranty Association; these claims are currently pending. Mr. McMahon's wife, Paulette, who was not involved in the accident, received the statutory limitation of $100,000.00 from the Texas Guaranty Association in settlement of her loss of consortium claim.
Upon considering the evidence presented, the trial court ruled that Caravan was a resident of Louisiana at the time of the accident, therefore subjecting LIGA to liability on the covered claim before it. The court further denied all of LIGA's demands for credits, holding LIGA liable for its statutory limits of $150,000.00, minus the statutory deductible of $100.00. LIGA took this appeal, challenging the liability ruling and alternatively, the trial court's refusal to credit the amounts of money received by Mr. McMahon and his wife against its liability.

COVERAGE
We first address the issue of whether David McMahon's claim is a "covered claim" under the scope of the Louisiana Guaranty Law. La.R.S. 22:1379(3)(a) sets forth the definition of a "covered claim" for the purpose of the Guaranty Law:
(3)(a) "Covered claim" means an unpaid claim ... which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Part applies issued by an insurer, if such insurer becomes an insolvent insurer after September 1, 1970, and:
(i) The claimant or insured is a resident of this state at the time of the insured event; or
(ii) The property from which the claim arises is permanently located in this state.
Because Mr. McMahon, the claimant, was not a resident of Louisiana, the only way his claim can be a covered one is if Caravan, the insured, was a resident of Louisiana at the time of the insured event. LIGA argues that the legislature intended to limit the residency requirement in La. R.S. 22:1379(3)(a)(i) to only one state. It urges this court to establish a rule that either the claimant or the insured must exclusively reside in the state of Louisiana in order for a claim to be a "covered claim" under that provision. Because Caravan operated its business out of Texas, LIGA submits that it is a resident of Texas and cannot, therefore, also be a resident of Louisiana. In support of this argument, LIGA points to La.R.S. 22:1386 of the Guaranty Law which states, in pertinent part:
B. Any person having a claim which may be recovered under more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured.....
LIGA insists that this language is indicative of the legislature's intent to limit the residency requirement to only one state, because the legislature refers to the "place" of the residence of the insured rather than "places." It also points to other instances where the legislature has defined the terms "residence" or "domicile" to mean something other than the ordinary meaning given to those terms.
The rules of statutory construction require this court to determine the intent and *1388 purpose of the legislature in enacting the law and to give effect, if possible, to that intent and purpose. Backhus v. Transit Casualty Company, 549 So.2d 283 (La. 1989). It is a well-settled premise of statutory construction that the words chosen by the legislature must be read in context and construed according to their common meaning. La.R.S. 1:3; Succession of Brown, 468 So.2d 794 (La.App. 1st Cir.1985). We are asked to construe the term "resident" in the context of the Louisiana Guaranty Law, which itself mandates that a liberal construction be employed in interpreting the law to carry out its purposes, one of which is to avoid financial loss to claimants because of the insolvency of an insurer. La.R.S. 22:1376; La.R.S. 22:1378; Senac v. Sandefer, 418 So.2d 543 (La.1982). When the legislature utilizes a term with a well-known meaning, it is logical to conclude that the intent was to convey the same meaning to that term. Thomas v. Thomas, 440 So.2d 879 (La.App. 2d Cir.), writ denied, 443 So.2d 597 (La.1983).
In effect, LIGA asks this court to read the term "resident" synonymously with the term "domiciliary." However, it is clear that under the jurisprudence of this state, the terms residence and domicile are not synonymous; a person may have several residences, but only one domicile. Wilson v. Butler, 513 So.2d 304 (La.App. 1st Cir.1987). Thus, the concept of "residence" has generally been given a broad meaning as opposed to the narrower construction given to the concept of domicile. Given the well-known meaning attached to the term "resident," as well as the liberal construction mandated by the Guaranty Law, we can only conclude that the legislature did not intend to require that the claimant or insured be actually domiciled in this state in order for the claim to be a covered claim. As long as the claimant or the insured legally resides in Louisiana, it is immaterial that either may also qualify for residence in a state other than Louisiana.
We next address whether Caravan was a resident of Louisiana at the time of the insured event. The record shows that Caravan was incorporated in Louisiana on March 26, 1963; it was a Louisiana corporation at the time of the accident. Its articles of incorporation list an Opelousas address as its registered office. The company initially operated a trucking business out of Opelousas, Louisiana. Sometime around 1970, Caravan was purchased by a resident of Texas. According to Mr. James Weathereley, who worked for Caravan from 1970 until 1984, the company began operating out of Irving, Texas, the home of its new owner, and opened up branch offices in several cities shortly after the sale. Caravan then began principally operating out of its Dallas terminal until it was taken over by another company sometime in 1984. However, it retained its corporate existence in Louisiana and continued paying franchise taxes in this state. Mr. Weathereley was unable to state whether or not Caravan had also incorporated in Texas; however, Mr. McMahon submitted documents certified by Texas' Secretary of State to represent all documents regarding Caravan on file with that office; none reveal that Caravan was ever incorporated in Texas. Those documents show that Caravan was a Louisiana corporation.
LIGA submitted various documents of the Louisiana Public Service Commission showing that after 1970, Caravan listed a Texas address for its principal office. However, these documents also show that Caravan did a substantial amount of business in Louisiana, as LIGA candidly admits in its brief. The PSC records show that Caravan obtained certificates to deliver goods to Louisiana from other states and from Louisiana to other states. Also, Caravan obtained a certificate of public convenience from the Louisiana Public Service Commission to transport goods for LouAnna Foods, Inc., a company located in Opelousas, Louisiana, to and from places exclusively in the state of Louisiana. Although LIGA attempts to characterize Caravan's activities in Louisiana as inherent in an interstate trucking business, the evidence suggests that Caravan did much more than *1389 merely pass through this state while making deliveries.
Thus, in summary, the evidence shows that at the time of the insured event, Caravan was a Louisiana corporation, paying franchise taxes to Louisiana. Although it is clear that the company carried out its central operations in Texas, it also conducted substantial business in Louisiana, including the delivery of goods for a Louisiana company exclusively within this state.
In those situations in which a corporation's residence is at issue, such as for jurisdictional and venue purposes, statutes of limitations, and exemptions from residency requirements, it is generally agreed that a corporation is a resident of the state of its incorporation. Further, as a general rule, whether or not a corporation acquires residence for one purpose or another outside its state of incorporation, it usually remains a resident of its state of incorporation. Fletcher Cyclopedia of the Law of Private Corporations, vl. 8 § 82, p. 154.
In Brown v. Gamble, 537 So.2d 476 (Ala. 1988), the Alabama Supreme Court was faced with an argument similar to that advanced by LIGA in this case. There, the insured was an Alabama corporation, but had substantial business contacts in Tennessee; Alabama's Guaranty Association refused to defend the insured, claiming that it should be defended by Tennessee's Guaranty Association. The court disagreed, holding that a corporation is a citizen or resident of the state under whose laws it was created, and because the insured was incorporated in Alabama, it was a resident of that state. However, a case relied on by LIGA held that a corporation's residence, for the purpose of a state's guaranty law, is determined not by the place of its incorporation, but where it has its principal place of business. Kroblin Refrigerated Xpress, Inc. v. Iowa Insurance Guaranty Association, 461 N.W.2d 175 (Iowa 1990).
We are not asked at this time to decide whether mere corporate existence is sufficient to satisfy the Guaranty Law's residency requirement. Instead, we are asked to determine whether a Louisiana corporation, which paid franchise taxes here and which conducted substantial business in this state, is a resident of Louisiana. Based on the facts of this case, we conclude that Caravan's incorporation in Louisiana, coupled with its business activity here, satisfies the residency requirement of the Guaranty Law. Therefore, we affirm the trial court's ruling that Mr. McMahon's claim is a "covered claim" subjecting LIGA to liability up to its statutory limits. We next address whether LIGA is entitled to any credits against that liability.

CREDITS

A. Worker's compensation benefits
The parties stipulated that Mr. McMahon received $320.00 in weekly compensation benefits from the date of the accident. LIGA argues it is entitled to a reduction against its liability for these amounts under La.R.S. 22:1386(1), which, prior to its amendment in 1990, stated:
§ 1386. Nonduplication of recovery
(1) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his rights under such policy. Any amount payable on a covered claim under this Part shall be reduced by the amount of any recovery under such insurance policy.
In Senac v. Sandefer, 418 So.2d 543 (La. 1982), the Supreme Court held that the purpose of this provision is to prevent double recovery, and stated that in determining whether LIGA is entitled to a credit against its liability, the focus should be on whether double recovery will result if a credit is not allowed. The court held that double recovery does not result where the claimant, who received worker's compensation benefits, also is the recipient of a stipulated *1390 judgment for general damages which does not include lost wages or medical benefits.
In Mr. McMahon's judgment, damages were apportioned for lost wages, medical expenses and pain and suffering; the general damage award for pain and suffering totalled $1,000,000.00. At trial, Mr. McMahon's attorney made it clear that it was only the general damages portion of the judgment that was being enforced against LIGA. Allowing Mr. McMahon to execute his judgment for general damages against LIGA, while retaining his worker's compensation benefits, would not result in double recovery, and under the Senac case, LIGA is not entitled to a credit.
LIGA argues that Senac's double recovery approach has been repudiated by the legislature, pointing to a 1990 amendment to the prohibition against duplication of recovery in La.R.S. 22:1386. Following its amendment by La.Acts 1990, No. 130, § 1, that provision reads, in pertinent part:
§ 1386. Nonduplication of recovery
A. Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required first to exhaust his rights under such policy. Such other policies of insurance shall include but shall not be limited to liability coverage, uninsured or underinsured motorist liability coverage, or both, hospitalization, and other medical expense coverage. Any amounts payable by such other insurance shall act as a dollar-for-dollar credit against any liability of the association under this Part.
Although the amendment does not refer specifically to worker's compensation benefits in the examples of other types of insurance to which it applies, LIGA insists that it is broad enough to encompass such benefits. It argues that this amendment is merely interpretative of the Senac decision because it makes it clear that there will be a dollar-for-dollar credit rather than a determination as to whether duplicative recovery will result, and this court may apply the amendment retroactively to Mr. McMahon's claim.
We do not believe this amendment can be characterized as "interpretative" of Senac. If LIGA were entitled to a credit, it would receive a credit for worker's compensation benefits received by a claimant who is seeking to enforce a general damage award which does not include lost wages or medical benefits. If we ruled in that fashion, we would be holding that the amendment overruled Senac. If it was the legislature's intent to overrule Senac, it would amount to a substantive change in the law, and this court could not retroactively apply the amendment, which had an effective date of September 7,1990, to this suit, filed on August 29, 1989. It is well settled that a substantive law can only apply to the future; it can have no retroactive application unless (1) the language clearly indicates otherwise, and (2) its retroactive application would not operate to divest a person of a pre-existing right. La.Civ.Code art. 6; La R.S. 1:2; Spragio v. Board of Trustees of State Employees Group Benefits Program, 468 So.2d 1323 (La.App. 1st Cir.), writ denied, 472 So.2d 32 (La.1985). There is nothing in the language of the amendment indicating it is to be given retroactive effect; therefore, we conclude that the trial court properly denied LIGA's demand for a credit for the amount of worker's compensation benefits received by Mr. McMahon.
B. Uninsured Motorist Benefits
LIGA seeks a credit of $40,000.00, the amount of uninsured motorist benefits received by Mr. McMahon. However, in Hickerson v. Protective National Insurance Company of Omaha, 383 So.2d 377 (La.1980), the Supreme Court held that the nonduplication provision of the Guaranty Law, La.R.S. 22:1386, the purpose of which is to prevent double recovery, did not apply to uninsured motorist coverage, which is required by public policy. The court rejected *1391 LIGA's argument in that case that a claimant had to first proceed against her own uninsured motorist carrier prior to seeking recovery against LIGA, and ruled that a determination of LIGA's liability must be made before deciding whether the claimant's uninsured motorist coverage was payable. Since LIGA stepped into the shoes of the tortfeasor's insolvent insurer, there was insurance in effect for the purpose of uninsured motorist coverage, which had to be exhausted before the uninsured or underinsured motorist coverage came into play. Thus, in Hickerson, the court held that LIGA is not entitled to credit the amount of uninsured motorist coverage available to the claimant in order to offset its liability.
The 1990 amendment to La.R.S. 22:1386, cited above, specifically includes uninsured/underinsured motorist insurance in those types of insurance which a claimant must exhaust prior to asserting a claim against LIGA, and it gives LIGA a dollar-for-dollar credit against its liability for the amount payable of this type of insurance. LIGA points to other amendments to the Guaranty Law, which it claims were designed to alleviate the concerns motivating the Court to rule in Hickerson. However, the 1990 amendment to the nonduplication provision cannot be seen as merely interpretative, procedural or remedial; by specifically including uninsured motorist coverage within its scope, it is an attempt to overrule Hickerson. To that extent, it is substantive and cannot be applied retroactively to Mr. McMahon's claim. La.Civ. Code art. 6; La.R.S. 1:2; Spragio v. Board of Trustees of State Employees Group Benefits Program, 468 So.2d at 1328. Accordingly, we conclude that the trial court correctly denied LIGA's demand for a credit for the uninsured motorist benefits paid to Mr. McMahon.

C. Loss of consortium claim
LIGA also seeks a credit for $100,000.00, representing the amount of money received by Mr. McMahon's spouse in settlement of her loss of consortium claim from the Texas Guaranty Association.[1] LIGA relies on La.R.S. 22:1386(2), in effect at the time this claim arose, which stated:
(2) Any person having a claim which may be recovered under more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured..... Any recovery under this Part shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent.
Mr. McMahon argues that this provision does not require him to credit the amount his spouse received for a loss of consortium claim against his recovery from LIGA because his wife's loss of consortium claim is separate and distinct from his personal injury claim. He contends that by its terms, the above provision refers to the claim of "any person;" he and his wife are two individuals asserting separate and distinct claims against LIGA, and therefore, the provision is not applicable.
LIGA, however, contends that a spouse's loss of consortium claim is a derivative one, and a loss of consortium claim and the claim of the person injured (from whom the loss of consortium claim arises) should be considered "one claim" for the purpose of the Guaranty Law. LIGA argues that because the claim of the injured person and the derivative claim of his spouse for loss of consortium are collectively "one claim," together they should be subject to LIGA's statutory limits of $150,000.00 per covered claim, and LIGA should be entitled to credit the amount received by Mrs. McMahon on her loss of consortium claim against Mr. McMahon's personal injury claim.
There are some cases which have held that an injured person's personal injury claim, and the spouse's loss of consortium claim, are not separate and distinct claims *1392 for the purpose of the bodily injury limits in a split-limit policy with per person limits of liability. For instance, in Albin v. State Farm Mutual Automobile Insurance Company, 498 So.2d 171 (La.App. 1st Cir.), writ denied, 498 So.2d 1088 (La.1986), Mr. Albin was injured in an automobile accident by the negligence of State Farm's insured. The State Farm policy contained limits of $10,000.00 for a single bodily injury and $20,000.00 for bodily injury to two or more persons per accident. State Farm paid Mr. Albin the $10,000.00 single bodily injury limits; his wife sought to recover damages for loss of consortium against State Farm as a second person suffering bodily injury. This court held that a wife's loss of consortium claim, in the absence of physical manifestations of the emotional injury, was not a separate "bodily injury" under the insurance policy. Although this court recognized that the wife did have a right of action against State Farm's insured for loss of consortium and her claim fell under the terms of the policy, it did so because it resulted from her husband's bodily injury. While Mrs. Albin could have recovered under the single bodily injury limits, she was foreclosed from doing so because her husband had already received the policy limits. Accord Carroll v. State Farm Insurance Company, 519 So.2d 265 (La.App. 5th Cir.), writ denied, 520 So.2d 756 (La.1988) (holding that a spouse's loss of consortium claim did not constitute a separate "bodily injury" under the terms of policy providing uninsured motorist coverage).
Other cases have reached the same result. In Shepard v. State Farm Mutual Automobile Insurance Company, 545 So.2d 624 (La.App. 4th Cir.), writs denied, 550 So.2d 627, 628 (La.1989), the court ruled that a loss of consortium claim does fall under the term "bodily injury" in an insurance policy. However, the court held that a loss of consortium claim is only derivative, arising out of injuries caused to others, and is therefore restricted to the monetary limits placed in the insurance policy to a per person total. Accord Sharff v. Ohio Casualty Insurance Co., 584 So.2d 1223 (La.App. 2d Cir.), writ denied, 589 So.2d 1055 (La.1991) (holding that a mother's loss of consortium claim is derivative, arising from her son's claim for bodily injury; therefore, the single person limit in an automobile insurance policy governed both the son's claim for personal injury and the mother's claim for loss of consortium).
Utilizing different theories, these cases have held that a claim for loss of consortium is not a separate and distinct bodily injury entitling a spouse to recover under a split-limit policy of insurance as a second person suffering bodily injury. However, the jurisprudence further recognizes that claims of a derivative nature will not be considered as "one claim" for all purposes.[2] With respect to the insurance coverage question, whether these claims will be treated as a single claim or as separate and distinct claim depends on the nature of the policy at issue. Thus, in Cooper v. Huddy, 581 So.2d 723 (La.App. 1st Cir.), writ denied, 585 So.2d 552 (La. 1991), this court held that five wrongful death claims constituted five separate covered claims under the insurance policy at issue. In that case, Mr. Cooper was killed in an automobile accident; his wife and four children from previous marriages (represented *1393 by their mothers) filed wrongful death actions in state and federal court against several insurers. Two of the insurers were declared insolvent and plaintiff named LIGA and the Pennsylvania Insurance Guaranty Association (PIGA) as defendants. Prior to trial, plaintiffs settled with PIGA for its statutory limits of $299,990.00. Plaintiffs then received a judgment in their favor, with the net award totalling $739,423.57. The trial court ordered LIGA to pay its statutory limits, $149,900.00, proportionately to each of the five claimants. This court reversed. Clearly, each of the five claimants had a personal cause of action for damages suffered as a result of Mr. Cooper's death; the issue was whether these separate causes of action constituted one or five "covered claims" under the Louisiana Guaranty Law. The policy involved was a combined single limit policy of $750,000.00, with no separate limits for per person injuries. Under the terms of the policy, each of the plaintiff's claims was a covered claim; consequently, each claim was a separate "covered claim" under the Guaranty Law, and each claimant was entitled to the per claim limit of $149,900.00, up to the maximum limits of the insurance policy, $750,000.00. This court stated that the result in the case would be different if the policy at issue had been a split-limit policy with per person limits of liability, noting that the courts have consistently interpreted the limits in split-limit policies as the limits for all damages arising out of bodily injury to one person. Among the cases cited for this proposition were the Albin, Shepard, and Carroll cases discussed above.
The policy involved in this case, written by Carriers Insurance Company, contains a single bodily injury limit of $1,000,000.00; there are no per person limits of liability. The policy defines "bodily injury" similarly to the policy in the Albin case as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." The policy also sets forth that its limit of liability is the total limit of the company's liability "for all damages for bodily injury, including damages for care and loss of services" as a result of any one occurrence. Mrs. McMahon's loss of consortium is a covered claim under the Carriers policy, which does not contain per person limits of liability and under the reasoning of Cooper v. Huddy, it is a separate covered claim under the Guaranty Act. Therefore, LIGA is not entitled to treat Mr. McMahon's personal injury claim and Mrs. McMahon's loss of consortium claim as a single "covered claim" under the Act, and accordingly, it may not credit the $100,000.00 received by Mrs. McMahon against its liability on Mr. McMahon's separate covered claim. The trial court correctly denied LIGA's demand for a credit.

CONCLUSION
Based on the foregoing, the judgment appealed from is affirmed in its entirety. LIGA is liable to Mr. McMahon up to its statutory limits of $149,900.00 (the statutory maximum minus the $100.00 deductible). Costs in the amount of $1,080.47 are assessed to the appellant, the Louisiana Insurance Guaranty Association.
AFFIRMED.
NOTES
[1] The record contains a letter from a representative of Texas' Guaranty Association who approved Mrs. McMahon's claim suggesting that the approval may have been made in error. As of the time of this appeal, however, Mrs. McMahon is in receipt of those funds and has not been required to return the proceeds of her settlement to the Texas Guaranty Association.
[2] A recent case illustrates this principle. In Aldredge v. Whitney, 591 So.2d 1201 (La.App. 2d Cir.1991), the court was asked to decide whether the settlement and release of the insurer by the primary victim injured in an automobile accident extinguished the loss of consortium claim by the claimant (who was the victim's boyfriend at the time of the accident and who later became her husband) against that insurer. The insurance company contended that because of the derivative nature of the loss of consortium claim, that claim was extinguished when the primary claim (the personal injury claim) was released. The opinion surveys the Louisiana jurisprudence on the derivative nature of the loss of consortium claim, discussing Albin, Carroll, Shepard, and Sharff, cited above. While accepting the premise that the loss of consortium claim is derivative of the primary victim's injuries, the court held that it is not derivative of the primary victim's ability to assert a claim, and the release by the primary victim did not extinguish the loss of consortium claim.